WOLVERINE GOLF CLUB *v.* SECRETARY OF STATE

DECISION OF THE COURT

1. CONSTITUTIONAL LAW—MANDAMUS—INITIATIVE—PETITION.

A writ of mandamus is granted ordering the Secretary of State to accept for canvass and immediate submission to the present session of the legislature of an initiative petition (1) on the ground that the statute requiring that an initiative petition be filed not less than ten days before the start of a legislative session is an unconstitutional restriction of the right of initiative, *per* LESINSKI, C. J., and (2) on the ground that the statute was repealed by implication by adoption of the Constitution of 1963, *per* LEVIN, J.; O'HARA, J., dissenting on the ground that the statute is in force and constitutional.

OPINION BY LESINSKI, C. J.

2. CONSTITUTIONAL LAW—SELF-EXECUTING PROVISION—LEGISLATION —LIMITATION.

*The legislature may not act to impose additional obligations on a self-executing constitutional provision so as to curtail or place undue burdens on a right guaranteed by the provision.*

3. CONSTITUTIONAL LAW—SELF-EXECUTING PROVISION—INTENTION— COMMENTS.

*Whether a constitutional provision is self-executing is largely determined by whether legislation is a necessary prerequisite to the operation of the provision, and is ultimately a question of the intention of the framers, the determination of which may properly include consideration of the comments of the constitutional convention.*

REFERENCES FOR POINTS IN HEADNOTES

[1] 42 Am Jur 2d, Initiative and Referendum § 50.
[2–4] 42 Am Jur 2d, Initiative and Referendum §§ 3, 21.
[5, 9] 42 Am Jur 2d, Initiative and Referendum § 57.
[6–8, 10–12] 42 Am Jur 2d, Initiative and Referendum § 31 *et seq.*

4. Constitutional Law—Self-Executing Provision—Initiative.

*The constitutional provision reserving the right of initiative to the people is self-executing (Const 1963, art 2, § 9).*

5. Constitutional Law—Initiative—Legislation—Intention.

*The framers of the constitution intended to limit the power of the legislature in implementing the initiative provision of the constitution to legislation which is necessary to effective implementation and any statute which is both unnecessary for the effective administration of the initiative process and restrictive of the initiative right is unreasonable and thus unconstitutional (Const 1963, art 2, § 9).*

6. Constitutional Law—Initiative—Filing of Petition—Ten-Day Limit—Statutes.

*The statute requiring that petitions to initiate legislation be filed with the Secretary of State not less than ten days before the beginning of a session of the legislature is unconstitutional because it constitutes an unnecessary and thus unreasonable restraint on the constitutional right of initiative in that it can cause delays ranging from 10 to 34 months between the time of filing and the time of popular vote (Const 1963, art 2, § 9; MCLA § 168.472).*

## Opinion by Levin, J.

7. Constitutional Law—Initiative—Filing of Petitions—Time for Filing—Intention.

*The constitutional convention chose to leave to the legislature the decision as to how long before a general election an initiative petition must be filed, and it imposed on the legislature the duty to implement the right of initiative; did not intend the question to be decided by default through operation of a statute antedating the Constitution of 1963 which merely repeated verbatim a provision of the Constitution of 1908 rejected by the Constitutional Convention of 1961 (Const 1963, art 2, § 9).*

8. Constitutional Law—Initiative—Time for Filing—Statutes—Repeal by Implication.

*The statute requiring initiative petitions to be filed no later than ten days before the start of a legislative session merely restated a provision of the Constitution of 1908 and therefore could not and did not embody a decision of the legislature; it was repealed by implication by the Constitution of 1963*

*because it was repugnant to the clear intention of the Constitutional Convention that the legislature should decide the time-of-filing question (Const 1963, art 2, § 9; art 3, § 7; MCLA § 168.472).*

9. STATUTES—REENACTMENT—LEGISLATIVE COMMITTEE—INACTION.

*A statute section repealed by implication by adoption of the Constitution of 1963 could not be and was not inferentially re-enacted by the failure of a special committee to advert to that section at the time the committee recommended changes in companion sections of the statute to make them conform to the new constitution (MCLA § 168.472).*

### DISSENTING OPINION BY O'HARA, J.

10. CONSTITUTIONAL LAW—INITIATIVE—STATUTES—FILING OF PETITION—CONSTITUTIONALITY.

*The statutory requirement that initiative petitions be filed with the Secretary of State not less than ten days before the beginning of a legislative session does not impinge upon the people's constitutionally-reserved right of initiative because the ten-day filing period is a legislative attempt to expedite the initiatory process by guaranteeing legislative action as early as possible in any given session (Const 1963, art 2, § 9; MCLA § 168.472).*

11. CONSTITUTIONAL LAW—INITIATIVE—STATUTES—FILING OF PETITION—REASONABLENESS.

*The statutory requirement that initiative petitions be filed with the Secretary of State not less than ten days before the beginning of a legislative session is reasonably related to the time both for the necessary administrative action by the Secretary of State and for legislative deliberation in order to avoid utter chaos in the submission of initiative proposals to the subsequent elective process (MCLA § 168.472).*

12. CONSTITUTIONAL LAW—STATUTES—APPEAL AND ERROR.

*The function of a reviewing court is to resolve each doubt regarding the constitutionality of a statute in favor of its validity, not to view the statute critically for every suggestion of its unconstitutionality consequently, even if there were a suggestion of unconstitutionality in the statutory requirement that initiative petitions must be filed with the Secretary of State not less than ten days before the beginning of a legislative session, that suggestion should be resolved in favor of its constitutionality (MCLA § 168.472).*

Original action in the Court of Appeals. Submitted Division 2 June 15, 1970, at Detroit. (Docket No. 9,018.) Decided June 25, 1970. Leave to appeal granted August 17, 1970. 383 Mich 818.

Complaint for mandamus by the Wolverine Golf Club and Joseph G. Comeau against James M. Hare, Secretary of State, to compel acceptance of an initiative petition for canvass and for immediate submission to the legislature. Writ granted.

*Craig & Fieger,* for plaintiffs.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Charles D. Hackney* and *Stewart H. Freeman,* Assistant Attorneys General, for defendant.

Before: LESINSKI, C. J., and LEVIN and O'HARA,* JJ.

LESINSKI, C. J. Plaintiffs Wolverine Golf Club and Joseph Comeau have filed the instant suit as an original action before this Court seeking a writ of mandamus ordering defendant Secretary of State to accept an initiative petition[1] for canvass and immediate submission to the present session of the legislature.

The facts giving rise to this suit are not disputed. In 1966 the Congress of the United States enacted the Uniform Time Act, 15 USCA, §§ 260–267, which required "Daylight Saving Time" in all time zones from the last Sunday in April until the last Sunday

---

* Former Supreme Court Justice, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23, as amended in 1968.

[1] Const 1963, art 2, § 9.

in October.  Pursuant to a provision of the Uniform Time Act, the Michigan legislature exempted this state from the act, thus keeping Michigan on what was formerly standard time.  MCLA § 435.211, *et seq.* (Stat Ann 1970 Cum Supp § 18.872[1] *et seq.*).

The effect of MCLA § 435.211, *et seq., supra,* was suspended by the filing of referendum petitions. *Michigan Farm Bureau* v. *Secretary of State* (1967), 379 Mich 387.  Michigan, therefore, went on daylight saving time during most of the summer of 1967 and all of the summer of 1968.  However, when the referendum was presented to the voters during the general election held November 5, 1968, MCLA § 435.211, *et seq., supra,* was approved by a margin of 490 votes out of the 2,805,614 votes cast.

MCLA § 168.472 (Stat Ann 1956 Rev § 6.1472), provides: "Petitions to initiate legislation shall be filed with the Secretary of State not less than 10 days before the beginning of a session of the legislature."  The present session of the legislature convened on January 14, 1970.

On February 12, 1970, counsel for plaintiffs inquired of the Secretary of State by letter whether initiative petitions would be accepted notwithstanding the statutory deadline.[2]  The Secretary of State replied that the statute prohibited acceptance of the petitions for submission to the 1970 session of the legislature or the electorate in the 1970 general elec-

---

[2] On oral argument of this cause plaintiffs moved to amend their complaint to add the allegation that they have a sufficient number of signatures upon petitions for *prima facie* compliance with the requirements of Const 1963, art 2, § 9.  Further, at oral argument the attorney for plaintiffs stated in open court and on the record that he had actual knowledge that this allegation was factually correct.  The motion was granted.

We take judicial notice of the fact that plaintiffs' petitions allegedly bear approximately 206,000 signatures and were filed with the Secretary of State on June 17, 1970.

tion. Subsequently, plaintiffs commenced the instant suit seeking a writ of mandamus.[3]

As mandamus is clearly the proper remedy if plaintiffs are entitled to relief, *Solo* v. *City of Detroit* (1942), 303 Mich 672; *Toan* v. *McGinn* (1935), 271 Mich 28, we turn to the merits of the case. The sole issue raised by plaintiffs is whether the statutory requirement that initiative petitions be filed not less than ten days before the start of a legislative session is an unconstitutional restriction of the right of initiative.

Resolution of this question requires an understanding of the initiative process, its historical setting in Michigan, and the background of the statutory 10-day filing deadline. We, therefore, turn to a brief review of these points.

Essentially, there are two types of initiative in Michigan. A *direct* method operates independent of the legislature wherein a proposal backed by a sufficient number of signatures is automatically placed on the ballot. This method is made available only to proposed constitutional amendments and is incorporated in Const 1963, art 12, § 2. Under constitutional initiative, signatures amounting to at least 10% of the total vote cast for all candidates for Governor in the last general election are required to place the proposal on the ballot. In addition, the petitions must be filed with the Secretary of State at least 120 days prior to the general election.

The second type of initiative available in Michigan is the *indirect* method which requires that the proposal first be submitted to the legislature for approval, rejection or for an alternative proposal.

---

[3] While the complaint was pending in this Court, petitioners filed in the Supreme Court an application for leave to appeal prior to decision by the Court of Appeals. By order of the Supreme Court, the application was denied on March 31, 1970.

After the expiration of 40 legislative session days, the proposal must be placed on the ballot of the next general election unless the legislature enacts the proposal into law without change. The indirect initiative method is available only for statutory proposals and is incorporated in Const 1963, art 2, § 9. Statutory initiative requires signature petitions amounting to only 8% as opposed to 10% for constitutional initiative. In this respect it is obvious that a statutory initiative petition drive is slightly less difficult than a constitutional initiative petition drive.

Nevertheless, history has demonstrated that the statutory initiative process has been much less attractive to the electorate as a method of direct government. A study of direct government techniques in Michigan from 1913 to 1961 revealed that the *constitutional initiative* process was utilized by the electorate on 35 separate occasions, whereas the *statutory initiative* process was invoked only once. On that occasion in 1948 petitions qualified a statutory proposal which would render a 1901 statute prohibiting the sale of colored margarine of no effect. The legislature enacted the proposal which should have avoided the necessity of submitting the question to the electorate. However, opponents of the measure were able to qualify the legislation for referendum. Thus, the statute did not become operative until passed by the people in 1950.[4]

The dormant *statutory* initiative process, in sharp contrast to the frequently invoked *constitutional* initiative process, was a subject of discussion prior to the 1961 Constitutional Convention.

---

[4] McHargue, Direct Government in Michigan, Michigan Constitutional Convention Studies, prepared for Constitutional Convention Preparatory Commission (1961); Pollock, The Initiative and Referendum in Michigan, University of Michigan Press (Michigan Governmental Studies, No 6) (1940).

"Why has the indirect statutory initiative been used so seldom? It would seem that the delay inherent in the process (and delay occurs unless legislative acquiescence is forthcoming and even then if opponents can gather sufficient signatures for a referendum petition) militates against the chance of successful promotion of such a measure. Then, too, the direct constitutional initiative requires only a slightly higher percentage of petition signatures and has the advantage of attracting more interest and receiving a direct popular vote. Whatever the reasons, the indirect initiative has been one of the least used of Michigan's devices of direct legislation." McHargue, Direct Government in Michigan, Michigan Constitutional Convention Studies, prepared for the Constitutional Convention Preparatory Commission (1961), No 17, p 30.

"One may say, therefore, that the limited effect of the initiative and referendum has not been due to any inherent defects in the institutions themselves, but rather to the limitations and restrictions on their use imposed principally by the legislature." Pollock, The Initiative and Referendum in Michigan, University of Michigan Press (Michigan Governmental Studies, No 6) p 68 (1940).

California had a constitutional provision providing for indirect initiative as well as direct initiative. Even in that state, notorious for direct government activity, indirect initiative had been used only on four occasions from 1912 to 1966.[5]

---

[5] Discussing this fact, it was noted:

"The statewide indirect initiative has been used but four times since 1912 and would be eliminated entirely by a revision of article 4 of the Constitution which will appear on the November ballot. West's California Legislative Service 416–417, 424–425 (1966); California Constitution Revision Commission, Proposed Revision of the California Constitution 52, 141–142 (1966) [hereinafter cited as Constitution Revision Commission]. For further discussion of the revision see note 29 *infra*. A possible explanation for the failure of persons to take advantage of the lower signature requirement for indirect initiatives may be the extreme delay which stands between the completion of signature gathering and final submission of the

The Ohio Constitution provided for a method of statutory initiative which like Michigan was indirect. It also provided for direct *constitutional* initiative and experienced similar inactivity with regard to the statutory initiative process.[6]

The initiative process was among the methods of direct government which gained considerable favor among the electorate during the progressive reform era of the early 1900's. At the Constitutional Convention of 1907, the first effort to provide the people of the State of Michigan with a form of direct initiative came to fruition in Const 1908, art 17, § 2. It passed the convention by merely three votes, although its provisions were limited to constitutional initiative and the requirement that petitions be signed by at least 20% of the number of electors who

---

measure to the voters. Unless the governor should call a special election, a minimum of approximately 23 months passes before an indirect initiative is placed on a ballot. This delay results because the indirect initiative procedure calls for submission of the proposed measure to the legislature before it convenes (Cal Const art 4, § 1 [¶ 4]); the legislature convenes for general legislative sessions in January of every odd numbered year (Cal Const art 4, § 2[a]); the measure, if not enacted within 40 days, must be presented at the ensuing general election (Cal Const art 4, § 1 [¶ 4]), but that general election does not come until November of the next even numbered year (Cal Const art 4, § 3). Under the proposed revision of article 4, the legislature would hold annual legislative sessions (Constitution Revision Commission 29–30), and, if the indirect initiative were retained, it might become a more viable tool. The period of delay could be reduced to as little as 10 months and a few days. Staff Memorandum for California Constitution Revision Commission, January 12, 1965, p 11." Comment, The Scope of the Initiative and Referendum in California, 54 Cal L Rev 1717, N19 at 1720 (1966).

6 "The record of direct legislation in Ohio discloses the interesting fact that the device has been employed more freely at the constitutional than the statutory level. Between 1912 and 1950, 29 constitutional amendments were proposed by the initiative. Nine were ratified. During the same period 15 of 29 amendments proposed by the general assembly were approved. Seventeen legislative measures have been proposed by the initiative. Of these, three were enacted by the general assembly. Three not so enacted were carried to the voters by supplemental petition; one was adopted." Fordham and Leach, The Initiative and Referendum in Ohio, 11 Ohio State Law J 495, 497 (1950).

had voted for Secretary of State in the last election made its accessibility virtually impossible. As it existed under the original draft of the 1908 Constitution, the constitutional provision was never used.[7]

In January of 1913 Senator Woodworth and Representative Kappler introduced almost identical bills proposing an amendment to the Constitution which would establish a more accessible constitutional initiative and a newly-created statutory initiative.[8] These bills received almost unanimous support by the legislature and in April of the same year the electorate approved the amendments. The signature requirement of the constitutional initiative process was reduced to 10%. The statutory initiative process was incorporated into art 5, § 1 and provided in pertinent part:

> "Initiative petitions shall set forth in full the proposed measure, and shall be filed with the Secretary of State not less than ten days before the commencement of any session of the legislature. * * * Upon receipt of any initiative petition, the Secretary of State shall canvass the same to ascertain if such petition has been signed by the requisite number of qualified electors, and if the same has been so signed, the Secretary of State shall transmit such petition to the legislature as soon as it convenes and organizes. The law proposed by such petition shall be either enacted or rejected by the legislature without change or amendment within forty days from the time such petition is received by the legislature."

It should be noted that Constitution expressly required that statutory initiative petitions be filed with the Secretary of State not less than ten days before the commencement of any session of the legislature.

---

[7] McHargue, *supra*, p 21 *et seq.*
[8] PA 1913, Concurrent Resolution Nos 3–4, pp 780–86.

The statutory initiative provision of the Constitution was amended by a proposal which passed both houses of the legislature in 1941[9] and won approval by the electorate in the spring election. The procedure was changed only to the extent that the Secretary of State was granted constitutional authority to check the names appearing on petitions against the names of registered voters. In that same year the legislature enacted PA 1941, No 246, which implemented the changes brought about by the constitutional amendment.

In addition to the implementing statutes passed in 1941, many of the requirements for initiative and referendum set forth in the highly detailed constitutional provision[10] were reiterated in statutory form in PA 1941, No 246 (CL 1948, § 200.1 *et seq.*; Stat Ann 1941 Cum Supp § 6.685[1] et seq.)[11] Among the constitutional provisions so codified was PA 1941, No 246, § 2 (CL 1948, § 200.2; Stat Ann 1941 Cum Supp § 6.685[2]) which provided:

"Petitions to initiate legislation shall be filed with the Secretary of State not less than 10 days before the beginning of a session of the legislature."

---

[9] PA 1941, Joint Resolution Nos 1 and 2, pp 781–85.

[10] Const 1908, art 5, § 1.

[11] PA 1941, No 246 restated the following constitutional requirements:

No 246, § 1 enacted the Const 1908, art 17, § 2 requirement that constitutional initiative petitions be filed four months before the election at which the proposal was to go to the voters;

No 246, § 2 enacted the art 5, § 1 requirement that statutory initiative petitions be filed 10 days before the commencement of the legislative session;

No 246, § 3 enacted the art 5, § 1 requirement that referendum petitions be filed within 90 days of the adjournment of the legislature;

No 246, § 7 enacted the art 17, § 2 requirement that a declaration of the sufficiency of the petition be filed at least two months prior to the election;

No 246, § 12 enacts the art 5, § 1 provision regarding the form of the petition and provides further details not set forth in the Constitution.

PA 1941, No 246 was repealed by PA 1954, No 116, commonly known as the Michigan Election Law. The 1954 act was the result of a major effort on the part of the legislature to reorganize, consolidate and add to the election laws. The above-quoted statute reappeared unchanged as MCLA § 168.472 (Stat Ann 1956 Rev § 6.1472). Due to the historical origin of the 10-day filing deadline and context of the statute in which it was first codified, it appears that it was first enacted as a notice provision of important constitutional details.

It is against this background that the Constitutional Convention delegates formulated and the Michigan electorate adopted Const 1963, art 2, § 9. In pertinent part § 9 provides:

"To invoke the initiative * * * , petitions signed by a number of registered electors, not less than eight percent for initiative * * * of the total votes cast for all candidates for governor at the last preceding general election at which a governor was elected shall be required.

"Any law proposed by initiative petition shall be either enacted or rejected by the legislature without change or amendment within 40 session days from the time such petition is received by the legislature. If any law proposed by such petition shall be enacted by the legislature it shall be subject to referendum, as hereinafter provided.

"If the law so proposed is not enacted by the legislature within the 40 days. the state officer authorized by law shall submit such proposed law to the people for approval or rejection at the next general election.

                *          *          *

"The legislature shall implement the provisions of this section."

Among the several details eliminated from the Constitution is the 10-day filing deadline. Neverthe-

less this former constitutional requirement remains enshrined in the statute now under attack.

The 10-day filing deadline was clearly necessary and reasonable in 1913, when it first became law. This was due to the combined effect of three factors then in existence. (1) Under the 1908 Constitution, as originally adopted, the legislature met only during the odd-numbered years.[12] (2) During this period the sessions of the legislature were quite short, generally convening in January and adjourning in May or June.[13] (3) The statutory initiative provision in Const 1908, art 5, § 1 gave the legislature only "40 days" to accept or reject initiative proposals, unlike the "40 session days" in Const 1963, art 2, § 9. Clearly under the provisions of the 1908 Constitution and realities prior to 1951, if no deadline had been set to insure the early presentation of initiative proposals to the legislature after time was allowed for the necessary certification of the signatures, the legislature might not get a full 40 days before adjournment. And, since the legislature was given

---

[12] Const 1908, art 5, § 13 provided:

"The legislature shall meet at the seat of government on the first Wednesday in January, *nineteen hundred nine,* and on the first Wednesday in January in every second year thereafter, and at no other place or time unless as provided in this Constitution; and shall adjourn without day, at such time as shall be determined by concurrent resolution, at twelve o'clock noon."

The practice of having regular sessions only during the odd numbered years was not changed until Const 1908, art 5, § 13 was amended by legislative proposal in 1951 and ratified at the biennial spring election of April 2, 1951.

[13] Michigan Manual, 1969–1970, p 98, sets forth the following dates:

| Date of Meeting | Date of Adjournment |
| --- | --- |
| January 4, 1899 | June 24, 1899 |
| January 2, 1901 | June 6, 1901 |
| January 7, 1903 | June 18, 1903 |
| January 4, 1905 | June 17, 1905 |
| January 2, 1907 | June 29, 1907 |
| January 6, 1909 | June 2, 1909 |
| January 4, 1911 | May 2, 1911 |
| January 1, 1913 | May 15, 1913 |

only "40 days" rather than "40 session days" the period would continue to run while the legislature was not meeting. Moreover, even if provision had been made to allow the period of legislative consideration to continue from one session to the next, it would mean a postponement of nearly 1-1/2 years dividing the 40 days into two shorter periods. Thus, the 10-day deadline was reasonable and necessary to insure that the legislature would have an opportunity to consider the proposal.

All three of these factors no longer exist, however. The legislature now meets every year.[14] The sessions of the legislature are much longer, often running from January to December. And the legislature now has "40 session days" rather than only "40 days" in which to consider the proposal. Thus, the petitions can be presented well after a session commences and still allow sufficient time for legislative consideration. If the legislature adjourns, the remainder of the "session days" will continue during the next session.[15] And now the periods between sessions are generally only a matter of weeks,

---

[14] Const 1963, art 4, § 13.

[15] During the debates the following exchange took place (2 Official Record, Constitutional Convention 1961, p 3085):

"*Mr. Brake:* Mr. President, ladies and gentlemen of the convention, I have a question. In column 2, page 3, line 38, where it is talking about legislative action on initiative petitions presented to the legislature, it says this must be done within 40 days. I wonder if that shouldn't be 40 legislative days. *Suppose this petition is presented the last day before the legislature adjourns, or while they're completely in recess?*

"*Vice President Hutchinson:* Mr. Brake, are you directing a question to a particular person?

"*Mr. Brake:* Yes, Dr. Pollock, please.

"*Mr. Pollock:* Mr. President, this was not before our committee as a substantive matter. * * * Therefore, I'm not prepared to answer your question, although it seems to me your point is very well taken." (Emphasis supplied.)

In direct response to this problem the language of the article was amended to read "within 40 session days" to insure that if a petition is filed shortly before adjournment the time period does not continue to run during adjournment.

rather than the old 1–1/2 years, thus reducing the possibility that the deliberations held during the previous session will be no longer remembered.

Although the original factual basis for the filing requirement no longer exists and although the reason for enactment of the requirement in statutory form (*i.e.*, notice provision of constitutional detail) is no longer present, nevertheless, this Court is bound to recognize the statute as an expression of legislative intent by the clear command of Const 1963, art 3, § 7 which provides:

"The common law and the statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitations, or are changed, amended or repealed."

Our only inquiry must be whether the statute is repugnant to the Constitution.

It is settled law that the legislature may not act to impose additional obligations on a self-executing constitutional provision. *Soutar* v. *St. Clair County Election Commission* (1952), 334 Mich 258; *Hamilton* v. *Secretary of State* (1924), 227 Mich 111, 125:

" 'The only limitation, unless otherwise expressly indicated, on legislation supplementary to self-executing constitutional provisions is that the right guaranteed shall not be curtailed or any undue burdens placed thereon.' "

Whether a constitutional provision is self-executing is largely determined by whether legislation is a necessary prerequisite to the operation of the provision. See 42 Am Jur 2d, Initiative and Referendum, § 3.

"A constitutional provision may be said to be self-executing, if it supplies a sufficient rule, by means of which the right given may be enjoyed and protected,

or the duty imposed may be enforced, and it is not self-executing when it merely indicates principles, without laying down rules by means of which those principles may be given the force of law."

Cooley, Constitutional Limitations (7th Ed) p 121, quoted in *Thompson* v. *Secretary of State* (1916), 192 Mich 512, 520, wherein the Court declared art 5, § 1 (initiative and referendum) of the Michigan Constitution of 1908 to be self-executing.

Whether art 2, § 9 is self-executing has been questioned by Dr. Nord, a delegate to the Constitutional Convention of 1961–1962. His argument centered on the provision in § 9 that in the event the legislature failed to enact the proposal, the duty to place the proposal on the ballot was vested in the "state officer authorized by law".

"*Section 9.  (Initiative and referendum)*:  There are two principal changes in this section.  One of them permits the legislature by a three-fourths vote to amend or repeal an act adopted by the people by direct initiative or referendum.  The other change is the elimination of a considerable mass of so-called 'legislative-type detail' relating to the initiative and referendum procedures.  While the 'Address to the People' asserts that this section continues to be self-executing, it is highly questionable whether or not this is true.  The following examples will illustrate the problems raised:  (1) In the fourth paragraph, the 'state officer authorized by law' is relied on to submit to the electors any legislation proposed by initiative but not enacted by the legislature within forty days, and also to submit to the electors for ratification any modification adopted by the legislature.  The 1908 Constitution placed this responsibility on the Secretary of State, except as otherwise provided by statute.  At present, a statute placed the responsibility on a board composed of the State Board of Canvassers and the Attorney General, but this statute now requires revision.  In the event that

this statute should ever disappear, it is an interesting question as to how the initiative process could be effectuated." Nord, The Michigan Constitution of 1963, 10 Wayne L Rev 309, 320 (1964).

This objection to the otherwise self-executing provision was raised by Dr. Nord on the floor of the Constitutional Convention. At that time the following argument was presented in response:

"Mr. Chairman, I suppose that as a very technical kind of a situation maybe Dr. Nord has a point, except I don't think it is a very practical one. It's inconceivable to me to believe that any legislature would refuse to empower or direct an official to handle this thing. As a matter of fact, we already have statutes on the books. The general election law is already there." 2 Official Record, Constitutional Convention 1961, p 2393, remarks of Delegate Hutchinson.

It is not inconceivable that the State judiciary would in such event be able to order the person charged with the ministerial responsibilities under the general election law to place the proposal on the ballot if this responsibility was not specifically delegated by statute.

However, it is not necessary to resolve that issue. The question whether a constitutional provision is self-executing is "ultimately one of intention." *American Youth Foundation* v. *Township of Benona* (1967), 8 Mich App 521, 528. The convention comment, which may properly be considered when attempting to discover the intent of the framers (*Beech Grove Investment Company* v. *Civil Rights Commission* [1968], 380 Mich 405; *Burdick* v. *Secretary of State* [1964], 373 Mich 578), expressly states that the provisions of art 2, § 9 are self-executing.

"Matters of legislative detail contained in the present section of the Constitution are left to the leg-

islature. *The language makes it clear, however, that this section is self-executing* and the legislature cannot thwart the popular will by refusing to act." (Emphasis supplied.)

To hold that the right of initiative reserved to the people of the State of Michigan is not self-executing is to ignore the expressed intent of the framers. This conclusion is more compelling in light of the perceptive opinion of Justice BIRD in *Hamilton* v. *Secretary of State* (1924), 227 Mich 111, 130:

"The initiative found its birth in the fact that political parties repeatedly made promises to the electorate both in and out of their platforms to favor and pass certain legislation for which there was a popular demand. As soon as election was over their promises were forgotten, and no effort was made to redeem them. These promises were made so often and then forgotten that the electorate at last through sheer desperation took matters into its own hands and constructed a constitutional procedure by which it could effect changes in the Constitution and bring about desired legislation without the aid of the legislature. It was in this mood that the electorate gave birth to the constitutional provision under consideration. In view of this I am persuaded that it was not the intention of the electorate that the legislature should meddle in any way with the constitutional procedure to amend the State Constitution. It was fittingly said in the following cases that:

" 'A constitutional provision designed to remove an existing mischief should never be construed as dependent for its efficacy and operation on legislative will.' "

We view the term "self-executing" to be more than an after-the-fact description of the operative effect of the constitutional provision. It is a term intended to cloak the provision with the necessary characteristics to render its express provisions free from

legislative encroachment. And this is so irrespective of the implementing provision contained therein.

The original language expressed in Committee Proposal 118b sought to make clear that the general implementing provision was not a blank check grant of legislative power.

"The legislature by general law shall provide further *necessary methods* for the exercise of these powers *not in conflict with the provisions of this section.*"[16] (Emphasis supplied.)

Following passage of Committee Proposal 118b the last sentence was changed by the committee on style and drafting to the form which was ultimately enacted. The style change, however, was clearly not intended to be a substantive change.[17]

The stautory initiative process contained in art 2, § 9 expressly limits legislative consideration of the initiated proposal to a period of 40 session days. Yet due to the statute in question, which requires the initiative petitions to be filed no less than 10 days prior to commencement of the legislative session, and Const 1963, art 2, § 5 which provides that general elections shall be held on the first Tuesday after the first Monday in November during each even-numbered year, the statute effectively operates to prevent a statutory initiative proposal from appearing on the ballot within a period of time less than 10 months after it is submitted to the legislature. By restricting access to the legislature, the statute

---

[16] 2 Official Record, Constitutional Convention 1961, p 2418.

[17] After proposal 118b returned from the style and drafting committee, the following statement was made at 2 Official Record, Constitutional Convention 1961, p 2927:

"*Mr. Hoxie:* Mr. President, I move that we dispense with the reading of this proposal, and I would like to state that since the return of these proposals from style and drafting, the committee has reviewed all of them. The committee finds no change, no substantive change in this proposal and we recommend that it be passed."

has effectively limited access to the statutory initiative process. And this restriction is in conflict with the express 40-day limitation contained in the Constitution. Any further delay of the proposal for the convenience of the legislature operates to restrict the right of initiative beyond permissible bounds.

"In cases where a provision is self-executing, legislation may still be desirable, by way of providing a more specific and convenient remedy and facilitating the carrying into effect or executing of the rights secured, making every step definite, and safeguarding the same so as to prevent abuses. Such legislation, however, must be in harmony with the spirit of the Constitution and its object to further the exercise of constitutional right and make it more available, and such laws must not curtail the rights reserved, or exceed the limitations specified." *State, ex rel. Caldwell,* v. *Hooker* (1908), 22 Okla 712, 718 (98 p 964).

Plaintiff notes that only two cases exist which deal with a situation similar to the present case. In *State, ex rel. Kiehl,* v. *Howell* (1914), 77 Wash 651 (138 P 286), the state constitution which expressly declared itself to be self-executing contained the following provision:

"This section is self-executing but legislation may be enacted especially to facilitate its operation."

The section referred to expressly reserved to the people the right of initiative provided that petitions were filed at least four months prior to the election. (This was a *direct* initiative process.) Pursuant to the constitution, the legislature enacted laws "facilitating" the operation of the initiative process. Included among those statutes was a provision requiring all petitions to be filed not earlier than ten months before the election.

The statute was challenged as an unconstitutional infringement of the initiative right since it limited the petition drive period to six months (between the tenth and fourth month preceding the election). The court upheld the statute noting that the statute allowed for greater certainty that the voters who signed the petition were, in fact, residents of the state on the date the petitions were filed. Six months was viewed as a reasonable period of time to garner the requisite signatures.

A contrary result was reached in the more recent case of *Yenter* v. *Baker* (1952), 126 Colo 232 (248 P2d 311). The right of initiative was expressly reserved to the people by the constitution which was deemed to be self-executing. Included within its provisions was the requirement that all petitions be filed at least four months prior to the election. (The initiative process was *direct.*) By statute it was required that all petitions be filed at least eight months prior to the election. The court struck down the statutory filing requirement of eight months, concluding that the legislature may not impose additional filing requirements.

The foregoing cases, although reaching different results, are not inconsistent. In *Kiehl, supra,* the challenged statute did not enlarge upon the minimum filing requirement which was included in the constitution. Rather, a different requirement was formulated. The court concluded that the statute did not conflict with the constitution or unreasonably limit the petition drive period, a maximum requirement imposed being considered necessary for assuring the validity of the signatures.

In *Yenter, supra,* the now-defunct statute enlarged on the filing limitation already present in the constitution, increasing the difficulty of the existing requirement. In the present case the ten-day filing

requirement imposes a time limitation for the convenience of the legislature in addition to the 40-session-day period expressed in the constitution. In this respect the statute conflicts with the express language of the constitution.

It is, however, defendant's position that the ten-day deadline is a reasonable exercise of the legislature's general duty under Const 1963, art 2, § 9 to implement that section of the constitution. Plaintiffs, however, argue that the time limit is an unreasonable restraint on initiative.

Unquestionably the ten-day deadline does act as a restraint on the right of initiative. As demonstrated above, the statute results in requiring that petitions be filed with the Secretary of State fully ten months prior to the general election. We note that defendant offers this Court no explanation whatsoever as to why such a period of time is needed.

Even conceding that during the ten months some time is needed to give the legislature the constitutional 40 session days to accept or reject the proposal, there is no need for this extended minimum period required by the statute. Const 1963, art 12, § 2 provides for constitutional amendment by petition and vote of the people. That provision requires petitions signed by 10% of the voters compared with the art 2, § 9 requirement of 8%.[18] Yet, although the percentage is greater, art 12, § 2 requires petitions to be filed only "120 days" or four months prior to the election.

Significantly art 12, § 2 further provides that the sufficiency and validity of constitutional initiative petitions be certified "at least 60 days prior to the election." Thus, the 120-day period provided in art

---

[18] Both percentages are of "the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected." Const 1963, art 2, § 9; art 12, § 2.

12, § 2 contemplates two months for certification of the sufficiency of the petitions and two more months for preparation of the ballots and presentation to the voters.

Adding these same periods to the "40 session days" allowed for legislative consideration of the statutory initiative proposal would result in a period of substantially less than 10 months.

Defendant argues that if the time limit is unreasonable, then statutes prohibiting the signing of fictitious or forged names to petitions would also be violative of the constitution. There is, however, an important distinction between statutes which protect the people from fraudulent attempts to bypass the legislature through initiative and those which create unnecessary obstacles to restrict the lawful use of initiative. Moreover, the legislature may undoubtedly place certain ground rules on the petitioning for initiative in order to facilitate the enormous task of verifying the signatures on the petitions. *Markowitz* v. *State Canvassers* (1965), 1 Mich App 12. This distinction was clearly noted in *State* v. *Snell* (1942), 168 Or 153, 160 (121 P2d 930, 934):

"Any legislation which tends to ensure a fair, intelligent and impartial accomplishment may be said to aid or facilitate the purpose intended by the Constitution. Any safeguard against deception and fraud in the exercise of the initiative and referendum powers tends to assure to the electorate the benefits conferred by § 1 of article 4.

"Such legislation, however, must be reasonable, not 'curtailing the right or placing any undue burdens upon its exercise.' *Stevens* v. *Benson, supra* [50 Or 269, 91 p 578]. Nor may it 'hamper or render ineffective the power reserved to the people.' *State, ex rel. Ayres,* v. *Amsberry* [1920], 104 Neb 273 (177 NW 179, 180, 178 NW 822); *State, ex rel. Elsas,* v.

*Missouri Workmen's Compensation* [1928], 318 Mo 1004, (2 SW2d 796)."

See, also, *Yenter* v. *Baker, supra.*

As indicated above, Const 1908, art 5, § 1 contained a highly detailed provision for statutory initiative. Many of these details were dropped when the successor provision, Const 1963, art 2, § 9, was adopted.

Defendant argues that the elimination of these points from the constitution was part of an effort to leave to legislative discretion matters of specialized and technical significance. In this regard defendant cites the 2 Official Record, Constitutional Convention 1961, p 2392,[19] where the chairman of the committee on legislative powers stated:

"Removed from constitutional status are the provisions on content and time of filing petitions, canvassing of names on petitions, type sizes, and right of the legislature to prescribe penalties. Also removed is the date of effectiveness of legislative acts which is covered in article 5, section 21.

"All of these matters are left to the legislature in the last sentence. However, the language of the last sentence also makes it clear that the section is self-executing and the legislature cannot thwart popular will by refusing to act."[20]

We agree with defendant's argument. Agreement, however, does not resolve the issue. For while the Constitution places the duty of implementation on the legislature, it does so as an incident to the

---

[19] See *Burdick* v. *Secretary of State* (1964), 373 Mich 578, allowing resort to the constitutional convention debates for the purpose of ascertaining the intent of the provisions of the Constitution.

[20] The substance of this statement was reiterated in the Convention Comment for art 2, § 9:

"Matters of legislative detail contained in the present section of the Constitution are left to the legislature. The language makes it clear, however, that this section is self-executing and the legislature cannot thwart the popular will by refusing to act."

granting of a right to the people. Although administrative implementation is needed if the initiative process is to function smoothly, the administrative statutes may not create unnecessary burdens which tend to restrict the constitutional right. The spirit of the Constitution is not met if the rights it grants are unnecessarily impaired under the guise of implementation.

Moreover, as noted above the original committee proposal 118b gave the legislature only the power to provide *"necessary methods* for the exercise of these powers [initiative] not in conflict with the provisions of this section". (Emphasis supplied.) There was, thus, the clear intent on the part of the convention[21] to limit the power of the legislature to that which is "necessary" to the effective implementation of the initiative right.

Thus, while the legislature has the power to establish the time of filing, since any deadline will act as a restraint on a constitutional right, the legislature may only create those restrictions which are necessary. Any statute which is both unnecessary for the effective administration of the initiative process and restrictive of the initiative right is unreasonable and thus unconstitutional.

When Const 1963, art 2, § 9 was reported out of committee at the Constitutional Convention, it stated that the legislature was to accept or reject the proposed law "within 40 days." (2 Official Record, Constitutional Convention 1961, pp 2390–2392.) As noted above, this phrase was changed to read "40 session days." The Constitutional Convention, thus, not only removed the ten-day deadline from the Consti-

---

[21] As noted above this language was changed by the committee on style and drafting to the present form found in Const 1963, art 2, § 9, but no substantive change was intended. 2 Official Record, Constitutional Convention 1961, p 2927.

tution but, as evidence by the record of the Constitutional Convention debate (see footnote 15), contemplated the filing of petitions much later in the legislative session.

Defendant agrees that initiative petitions may be filed at any time, but argues that filing after the statutory deadline results in submission of the issue to the following legislative session. Thus, in the instant case initiative petitions filed in 1970 would be submitted to the 1971 session of the legislature.

The weakness in defendant's argument centers in the unnecessary delays it would cause in the use of initiative. Const 1963, art 2, § 9 requires any law proposed by initiative which was rejected by the legislature be submitted "to the people for approval or rejection at the next general election." Under Const 1963, art 2, § 5, however, the elections are regularly scheduled on "the first Tuesday after the first Monday in November in each even numbered year." Thus, under the defendant's argument the petitions would be filed in 1970, go to the legislature in 1971 and finally be presented to the public for vote in November of 1972, nearly 2–1/2 years after the filing.

There are two basic reasons why we do not think such delays are consistent with the Constitution. First, the Constitution gives the legislature only 40 session days to consider the proposed law.[22] In light of such a restrictive limit on the legislature, we do not believe delays ranging from a minimum of 10 months to a maximum of 34 months between the time of filing and the time of the popular vote was intended. And if such extended delays had been approved by the convention, we doubt that the pe-

---

[22] For definition of "session days" see *Smith* v. *Attorney General* (1911), 165 Mich 140; *Davock* v. *Moore* (1895), 105 Mich 120; and OAG 1963–1964, No 4329, p 494 (November 3, 1964).

riod allowed for legislative consideration would have been so limited.

Second, we believe that when the convention provided for petitions filed long after the opening of the session, it indicated an approval of the "last minute" exercise of initiative. Such exercise thus should be limited only to the extent necessary to allow for the efficient administration of the initiative process.

One other difficulty remains with the delays inherent in defendant's position. While the instant suit involves daylight saving time, the right of initiative may be invoked for other issues of far greater importance and moment. If extended and unnecessary delays are permitted, issues may become moot before the public is permitted to act. We do not believe that such was the intent of the Constitutional Convention.

It might be argued, however, that since the ten-day filing deadline existed as a constitutional standard for half a century, that the same standard in statutory form cannot now be declared so unreasonable as to be unconstitutional. Despite its surface logic, however, the argument falls short for two reasons, both historical.

First, the statutory initiative provision in Const 1908, art 5, § 1, originated in the legislature as a proposed constitutional amendment in 1913. It was not the result of a constitutional convention or of constitutional initiative.[23] Thus when the electorate approved the ten-day deadline as a constitutional amendment in the April election of 1913, it was only one small part of a much larger provision. If they rejected the ten-day deadline, there would have been no statutory initiative provision at all. Thus, it

---

[23] Coincidentally it was the same proposal which resulted in reducing the signature requirement for constitutional initiative from an impossible 20% to an accessible 10%.

would be a fiction to say that the ten-day rule has stood as an expression of the overriding will of the people.[24]

Second, as demonstrated above, when the ten-day limit first became law it was clearly necessary and reasonable due to circumstances then existing. As the circumstances which necessitated the rule have all changed, it cannot be said that reasonableness of the rule necessarily remains.

We hold that MCLA § 168.472 (Stat Ann 1956 Rev § 6.1472), constitutes an unnecessary and, therefore, unreasonable restraint on the constitutional right of the people to initiative. The statute is, thus, unconstitutional.

In so holding we do not intimate that a time limit necessary and reasonable for the effective administration of the initiative process after the legislature has considered the initiative petition, might be invalid. Such will withstand challenge so long as it does not constitute an unnecessary restraint on the right of initiative.

The petition for a writ of mandamus is granted.

Levin, J. (*concurring in result*). The right of the people to propose a law (the initiative) and to reject a law (the referendum) was established by a 1913 amendment[1] to the 1908 Constitution.[2] The amendment spelled out at length provisions concerning the form of petitions and other details, including deadlines for filing petitions. The initiative and referendum section of the 1963 Constitution (art 2, § 9) is a condensation of the 1913 amendment[3]

---

[24] Moreover, it is interesting to note that the first time the ten-day limit was submitted to a popularly elected constitutional convention, it was taken out of the Constitution.

[1] PA 1913, p 793 *et seq.*

[2] Const 1908, art 5, § 1.

[3] The section added by the 1913 amendment (see footnote 1) was modified by vote of the people in 1941. See PA 1941, p 781 *et seq.*

and leaves to the legislature the task of spelling out details, including the time for filing a petition proposing a law.

The 1908 Constitution, as so amended in 1913, provided that a petition proposing a law may be filed not less than ten days before the legislature convenes. That constitutional requirement was reiterated in a section of a statute enacted in 1941[4] and was reenacted in 1954 as § 472 of the election law.[5] Since the adoption of the 1963 Constitution the legislature has not expressed its intention concerning the time for filing a petition proposing a law.

The questions presented in this case are whether the 1954 legislative restatement of the 10-days-before-the-session 1908 constitutional requirement was repealed by implication when the 1963 Constitution was adopted; and, if not, whether the ten-day provision is constitutional.

For weighty reasons of fundamental policy, we avoid constitutional questions if a case can be decided on less momentous grounds.[6] I see no need to reach the constitutional question because in my opinion the 1954 legislation, which merely parroted the 1908 constitutional provision, did not survive the adoption of the 1963 Constitution.

I.

Section 472 of the election law provides:

"Petitions to initiate legislation shall be filed with the secretary of state not less than 10 days before the beginning of a session of the legislature."

This paraphrased Const 1908, art 5, § 1 (initiative and referendum):

---

[4] PA 1941, No 246, § 2.
[5] MCLA § 168.472 (Stat Ann 1956 Rev § 6.1472).
[6] 16 Am Jur 2d, Constitutional Law, § 113, p 301.

"Initiative petitions * * * shall be filed with the secretary of state * * * not less than 10 days before the commencement of any session of the legislature."

The ten-days-before-the-session provision must be placed in context to be understood. Under the 1908 Constitution (1) the legislature met biennially in odd-numbered years until 1952 when it began to meet annually,[7] and (2) there was an April general election in odd-numbered years in addition to the November general election in even-numbered years.[8]

The operative effect of the ten-days-before-the-session provision was to require that a petition proposing a law be filed with the Secretary of State not later than either the closing days of December or the first few days of January, depending on the precise date the legislature would convene.[9] Canvassing was to be completed between the time the petition was filed and the date on which the legislature convened. If the petition was in order the Secretary of State was required to transmit the petition to the legislature when it convened. Within 40 days after receipt of the petition, *i.e.*, not later than the end of February, the legislature was either to enact or reject the proposed law. If the law was rejected, then within six weeks, at the spring election in April, the proposed law would be voted upon by the people. Thus, less than 3–1/3 months would intervene between the date 10 days before the session and the date of the election.[10]

---

[7] See Const 1908, art 5, § 13, as originally adopted, and PA 1951, p 594 for the amendment of that section.

[8] See Const 1908, art 7, § 2; art 11, §§ 2, 3 and 6; PA 1925, No 351, pt 1, ch 1, §§ 3, 4 and 5; PA 1917, No 203, §§ 3, 4 and 5.

[9] See footnote 7.

[10] The timetable for proposing a law established under the 1908 Constitution:

1. *Time for filing petitions with secretary of state.* Petitions shall be filed with the secretary of state "not less than 10 days before the commencement of any session of the legislature."

It is apparent that the ten-days-before-the-session requirement was a step in a relatively short time-table shaped around the facts that the legislature then met regularly only in odd-numbered years and that there was an election in April of such years.

This timetable was thrown out of kilter when in 1952 the legislature regularly began to meet annually. Since the "next ensuing general election" in even-numbered years is in November, the time between the last date for filing a petition with an even-numbered year legislature and the general election would be 10–1/3 months. Thus, under the 1908 Constitution, there came to be two different time spans: as to odd-numbered year legislatures, 3–1/3 months; and as to even-numbered year legislatures, 10–1/3 months.

Among the changes made by the 1963 Constitution was the elimination of the biennial spring election.[11] Now that there would no longer be a spring election, why continue to require that a petition proposing a law be filed ten days before the legislative session begins? Why should the 10–1/3-month time span,

---

2. *Canvassing of petitions.* "Upon receipt of any initiative petition the secretary of state or such other person or persons hereafter authorized by law shall canvass the same to ascertain if such petition has been signed by the requisite number of qualified and registered electors."

3. *Time when the secretary of state shall transmit the petition to the legislature.* If the "petition is legal and in proper form and has been signed by the required number of qualified and registered electors, such petition shall be transmitted to the legislature as soon as it convenes and organizes."

4. *Time for consideration of proposed law by legislature.* "The law proposed by such petition shall be either enacted or rejected by the legislature, without change or amendment, within 40 days from the time such petition is received by the legislature."

5. *Time for vote by the people.* "If any law so petitioned for be rejected, or if no action is taken upon it by the legislature within said 40 days, the secretary of state or such other person or persons hereafter authorized by law shall submit such proposed law to the people for approval or rejection at the next ensuing general election."

11 See Const 1963, art 2, § 5, and accompanying convention comment reprinted as annotation in 1 MCLA, p 770, and 1 Stats Ann 1965 Rev, p 431.

adventitiously established as to *even*-numbered years, because of the spring election during the biennial meeting of the legislature in *odd*-numbered years, be continued now that the factual background is completely reversed: the legislature now meeting annually, not biennially, and general elections now being held biennially, not annually?

These questions may have prompted the elimination during the drafting of the 1963 Constitution of the ten-days-before-the-session language as a constitutional requirement and the decision to leave the establishment of a time limit for filing a petition proposing a law to legislative decision:[12]

---

[12] The conclusion here expressed that the 1963 Constitution empowers the legislature to prescribe the time for filing a petition proposing a law necessarily rejects one aspect of the plaintiffs' constitutional challenge to the 10-day filing requirement, namely, the contention that the 1963 Constitutional directive that the legislature either enact or reject the law proposed by an initiative petition within 40 session days from the time the petition is received by the legislature (Const 1963, art 2, § 9) precludes the legislature from establishing any other time limitation.

The 1908 Constitution provided both that initiative petitions shall be filed 10 days before the legislature convenes and that the legislature shall act thereon within 40 days from the time the petition is received by the legislature. It is therefore apparent that a deadline for filing petitions is not necessarily inconsistent with a limitation on the amount of time the legislature can deliberate on an initiative petition. (The 1908 "40 days" time limitation was changed by amendment on the floor in the 1963 Constitution to "40 session days." [2 Record, p 3085].)

Also (see accompanying text, *infra*) the report of the 1961 constitutional convention committee which proposed art 2, § 9 (initiative and referendum) recommended elimination of the 10-days-before-the-session requirement, stating that matters of legislative detail, including the time for filing petitions, should be left to the legislature and at the same time recommended retention of the 40 days requirement; this indicates that the draftsmen of art 2, § 9 saw that there may be need for legislation concerning the time for filing petitions even though the Constitution retained the limitation on the amount of time the legislature could deliberate on a law proposed by an initiative petition.

Merely because a member of the convention visualized the possibility of a petition being filed on the last day of a legislative session (2 Record, p 3085), which was entirely possible with the elimination of the 10-days-before-the-session provision as a constitutional requirement and the implied repeal of § 472, does not

"The committee is of the opinion there is much within the existing section [Const 1908, art 5, § 1] of a purely legislative character and, therefore, several exclusions and changes are suggested.  *  *  *  Removed from constitutional status are the provisions on content and *time of filing petitions,* canvassing of the names on petitions, type sizes and right of the legislature to prescribe penalties."[13] (Emphasis supplied.)

"Matters of legislative detail contained in the present section of the constitution are left to the legislature."[14]

The last sentence of the initiative and referendum section of the 1963 Constitution imperatively provides:

"The legislature shall implement the provisions of this section." Const 1963, art 2, § 9.

Const 1963, art 3, § 7 provides:

"The common law and the statute laws now in force, not *repugnant* to this constitution, shall remain in force until they expire by their own limitations, or are changed, amended or repealed." (Emphasis supplied.)

---

preclude future legislation imposing reasonable time limits as contemplated by the constitutional convention.

The logistics of presenting initiative petitions and voting on a proposed law may well require the establishment of time limits in addition to the limit on the amount of time during which the legislature may consider a proposed law. Before legislative consideration can begin the petition must first be canvassed to determine its sufficiency or insufficiency. After the 40 session days have elapsed and before the issue can be submitted to the people, ballots and voting machine strips must be printed. All this requires time and it would be entirely consistent with the 40 session day requirement and the legislature's duty and prerogative to "implement" art 2, § 9 for the legislature to establish reasonable time periods for the canvassing of petitions and the printing of ballots and other voting materials.

[13] Report of the chairman of the committee on legislative powers of the 1961 constitutional convention, in submitting committee proposal 118, which, as amended, eventually became art 2, § 9 of the 1963 Constitution, 2 Record, p 2392.

[14] Convention comment; reprinted as annotation to art 2, § 9, 1 MCLA § 780, 1 Mich Stats Ann 435.

I think it clear that the constitutional convention which, when confronted with the two alternative time spans—3-1/3 months and 10-1/3 months— chose to leave the decision to the legislature, and which imposed on the legislature the duty of implementing the people's initiative and referendum rights, did not intend that this important question would be decided by default.

Section 472, which merely restated a 1908 constitutional requirement and which was adopted years before the 1961 constitutional convention confided to the legislature the task of deciding the time-of-filing-a-petition question, does not embody a legislative choice. Section 472 is "repugnant" (Const 1963, art 3, § 7) to the clear intention of the constitutional convention that the time-of-filing question would be decided legislatively. Section 472 was, accordingly, impliedly repealed by the 1963 Constitution.

## II.

Just as we should be slow to declare acts of the legislature unconstitutional, we should be equally careful to avoid finding legislative choice and decision where there is none. Both intrude upon the legislative preregotive.

It has been said that

"if the authority of the legislature to enact a particular statute is derived solely from a particular constitutional provision or amendment, a repeal of such provision or amendment operates as a repeal of the statute."[15]

Whatever authority the 1941 and 1954 legislatures had to enact the 10-day provision was clearly derived solely from the 1908 Constitution; a time limitation for filing petitions either one moment longer

---

[15] 50 Am Jur, Statutes, § 541, p 548.

or shorter than the 10-day provision could not have been constitutitionally adopted in 1941 or 1954.

In truth it is a misnomer to describe § 472 (§ 2 of the 1941 act) as legislation. The legislature might enact a law of nature or science; if this were done, it would remain a law of nature or science, and if proved to be incorrect in the light of more advanced knowledge it would not become more durable because enacted by the legislature. Similarly, if the legislature wishes to bask in the light of the people's vote and reiterate a constitutional requirement, it may do so but the reiterating enactment is merely a restatement of the Constitution, not an independent law.[16] If the constitutional provision so restated is repealed, then, in my opinion, the legislative restatement should ordinarily be deemed impliedly repealed.[17] Any other rule would elevate to permanent law an enactment which did not represent a legislative choice and decision when enacted and which did not have any independent significance or effect as law when enacted. To find a legislative intent or purpose in such a law one must ignore the salient fact that the policy there expressed was determined by the people, not the legislature,[18] and would, as

[16] "It is the business of courts to look through form to substance." On the same principle that documents which appear to be one kind of legal instrument have been held in reality to represent something else (*Rothenberg* v. *Follman* [1969], 19 Mich App 383, 391, n 14) § 2 of the 1941 act and § 472 of the 1954 act are not legislative, but constitutional in nature.

[17] A different question would be presented if there was evidence in the record of the 1961 constitutional convention that the convention relied on § 472 as pertinent existing legislation which would survive the effectiveness of the new Constitution until changed by affirmative legislative action.

[18] PA 1941, No 246, and chapter XXII of the election law, adopted in 1954, concern initiating petitions. Sections 1–3, which restate constitutional requirements, are an informative preamble to the provisions that follow concerning canvassing of petitions, judicial review and voting.

To ascribe to the 1941 and 1954 legislatures a purpose to enact legislation to become effective when, as and if the 1908 Constitution should be repealed would be to ascribe to those legislatures both

well, be inconsistent with the people's right to expect that legislative decisions shall be made when the legislature is free to act legislatively.

We are loath to interfere where a decision has been made by the people or the legislature in their spheres of competence in accordance with the political or legislative processes. It would be ironic, in the name of deference to legislative decision, to deny the people's right of initiative because of this nondecisional vestige of a former constitutional provision deliberately deleted from the present Constitution. To do so would be to add judicial to legislative inertia.

Chief Judge Lesinski has pointed out forcefully how § 472 unnecessarily clogs the right of the people to propose a law by initiative petition. But in 1941, when this section was first enacted, and in 1954 when it was reenacted, the legislature had no authority to reduce the time span and could not have considered his arguments on the merits. In 1963, with the adoption of the new Constitution, it could have done so. It seems to me that it is sounder to let the legislature consider the merits of his arguments and make the choice than to say that the choice was made by the 1941 and 1954 legislatures—when actually they had no choice—and then to hold that this nonchoice was unconstitutional because irrational.

III.

I am also satisfied that § 472 was not inferentially reenacted when the legislature met in special session in December, 1963. After the adoption of the new Constitution by vote of the people in 1963,[19] a bipar-

an extraordinary omniscience and, as well, a presumptuous purpose to invade the prerogative of the legislature sitting at the time of the repeal.

19 PA 1963, p 496.

tisan committee of the legislature was created to consider and recommend "to the legislature, in bill form or otherwise, proposed legislative actions best suited to the prompt, orderly and sound implementation of the recently adopted state constitution."[20] This committee recommended a number of laws, many of which were adopted during the second extra session of the 1963 legislature which met in December, 1963. Among these was PA 1963 (2d Ex Sess), No 9, which conformed §§ 471 and 474 of the Michigan election law to 1963 Constitutional provisions (art 2, § 9, and art 12, § 2) concerning the initiation of amendments and referendum petitions.

It may be, as has been contended, that members of the bipartisan committee reviewed § 472 and decided that the 10-days-before-the-session provision was sound and should be continued. But such a committee decision, unless communicated to and enacted by the legislature, is not a law. The legislature cannot delegate its legislative powers to a bipartisan legislative committee.[21] A law cannot be enacted except in the manner provided in the Constitution.

"There is no doubt that a legislative body may not delegate to another its lawmaking powers. It must promulgate, not abdicate." *Osius* v. *City of St. Clair Shores* (1956), 344 Mich 693, 698 (58 ALR2d 1079).[22]

The Constitution requires that "all legislation shall be by bill",[23] its object must be expressed in its

---

[20] 2 House Journal, pp 1397, 1398 (April 18, 1963).

[21] See dictum in *State* v. *Gaunt* (1885), 13 Or 115 (9 P 55); *Central of Georgia Railway Co.* v. *State* (1898), 104 Ga 831 (31 SE 531, 533). See, also, cases cited in footnote 22.

[22] Similarly, see *O'Brien* v. *State Highway Commissioner* (1965), 375 Mich 545, 557; *Lievense* v. *Unemployment Compensation Commission* (1952), 335 Mich 339, 342; *Coffman* v. *State Board of Examiners in Optometry* (1951), 331 Mich 582, 589. See, also, *People* v. *Collins* (1854), 3 Mich 343.

[23] Const 1963, art 4, § 22.

title,[24] and no bill may become a law unless it has been printed or reproduced and in the possession of each house for at least five days, read three times in each house, and approved by a majority of the members elected and serving of each house whose votes and names must be entered in the journal.[25] Additionally, the governor enjoys the power of veto.[26] These provisions, designed to insure knowledgeable and careful consideration by the members of the legislature and public awareness and accountability, leave no room for legislation by proxy.

Furthermore, there is no no evidence that the bipartisan committee did in fact consider the time of filing question. A staff memorandum prepared for the committee indicates that it conceived its function to be recommendation of changes needed to avoid conflict with the new Constitution, not to seek out areas where the legislature could now legislate but, formerly, was prohibited from acting.[27]

We know that the committee did an incomplete job, not only because the governor in a message said that much work remained to be done,[28] but also because a "necessary" conforming amendment to §§ 476 and 477 of the election law, also concerning initiatory and referendary petitions, was overlooked.[29]

---

[24] Const 1963, art 4, § 24.

[25] Const 1963, art 4, § 26.

[26] Const 1963, art 4, § 33.

[27] "Of course, the legislature is no longer bound to the details contained in the 1908 Constitution, but no changes are required to *conform* to the 1963 Constitution." Staff memorandum of April 22, 1963. (Emphasis supplied.)

[28] House Journal (2d Ex Sess 1963), December 3, 1919, p 19.

[29] Under the 1908 Constitution (art 5, § 1; art 17, § 2), the sufficiency or insufficiency of petitions was to be decided at least two months before the election. PA 1941, No 246, §§ 6, 7 (PA 1954, §§ 476, 477 [MCLA §§ 168.476, 168.477; Stat Ann 1956 Rev §§ 6-.1476, 6.1477]), repeats this language.

The 1963 Constitution, art 12, § 2, changes this time to 60 days as to petitions initiating a constitutional amendment. But PA 1963 (2d Ex Sess) No 9, apparently designed to make the changes

The wisdom of the constitutional provisions prescribing the manner in which the legislature may exercise its powers is illustrated by the facts of this case. Section 472, when enacted, did not represent a legislative choice; it merely repeated a constitutional requirement. Now it is claimed that because a bipartisan committee may have decided that § 472 represents a sound choice, that the legislature itself made a choice.[30]

---

in chapter XXII of the election law required to conform it to changes of that kind made by the 1963 Constitution, does not make conforming changes in §§ 476, 477.

[30] The argument that the 1963 legislature relied on § 472 as a viable statute begs the question whether it was impliedly repealed when the 1963 Constitution became effective. If it was so repealed, there was nothing to rely on.

Merely because § 472 was printed in a statute book, it does not set up an estoppel; all laws invalid because not properly enacted or because they are unconstitutional are printed in books, and sometimes are relied on by significant segments of the populace as valid for years before their invalidity is judicially declared.

Moreover, there is no way of knowing whether the legislature thought that § 472 would survive the effectiveness of the 1963 Constitution absent an expression from the legislature itself.

It would be pure fiction to conclude that the legislature was aware of § 472 and decided to rely on § 472 as an appropriate solution. There is not a particle of evidence that the 1963 legislature focused on the question. Indeed, the evidence points the other way; the staff of the bipartisan committee appears to have conceived its function in regard to chapter XXII of the election law (in which § 472 appears) to be discharged when it brought to the attention of the bipartisan committee proposed *conforming* changes (see footnote 27). And even if members of the staff of the bipartisan committee thought that § 472 would continue to be effective it does not appear that their view was communicated either to the bipartisan committee or the legislature.

In some judicial opinions it has been said that legislative silence after the promulgation of an administrative regulation or court decision is evidence bearing on the correctness of the administrative or judicial construction of a statute. (50 Am Jur, Statutes, § 326, pp 318, 319; 82 CJS, Statutes, § 359, pp 769, 770.) The inference has been criticized in trenchant opinions. *Sheppard* v. *Michigan National Bank* (1957), 348 Mich 577, 599; *Park* v. *Employment Security Commission* (1959), 355 Mich 103, 139; *Girouard* v. *United States* (1946), 328 US 61, 69, 70 (66 S Ct 826, 90 L Ed 1084); *United States* v. *Turley* (1957), 352 US 407, n 14 (77 S Ct 397, 1 L Ed 2d 430, 56 ALR2d 1300); *Wong Yang Sung* v. *McGrath* (1950), 339 US 33, 47 (70 S Ct 445, 94 L Ed 616); *Porter* v. *Roach* (D Or, 1946), 69 F Supp 56. There is no need to stop and analyze that issue. There is no evidence that the committee staff or the

I think it highly unlikely that the legislature, aware that it has a choice and aware of its responsibility, would continue to clog the people's right of initiating laws by a time-for-filing requirement which, while it made sense when the legislature met only in odd-numbered years and there was a spring election in such years, manifestly requires remolding in light of the complete reversal of the factual context—the legislature now meeting annually and general elections now being held only biennially.

If a bill proposing such an unnecessarily restrictive time limit is introduced and after public scrutiny is adopted by the legislature and signed by the governor or becomes law without his signature, it will be soon enough to consider its constitutionality.

Summarizing, the 1961 constitutional convention left to legislative decision the establishment of a time limit for filing a petition proposing a law. Section 472 of the election law, enacted in 1954, never represented a legislative decision but merely echoed language already in the 1908 Constitution. It was repealed by implication when the 1963 Constitution was adopted because it is repugnant to the decision of the constitutional convention that the time-of-filing question would be left to legislative determination.

The 1963 legislature delegated to a bipartisan committee the task of recommending changes in the laws required by the 1963 Constitution, but the com-

---

committee ever publicized a reliance on § 472 as continuing legislation. Furthermore, it has never been suggested that a legislature can enact a law by silence or inaction.

The common law is, indeed, replete with fictions. We should, however, be chary of creating and indulging new fictions regarding the legislative process when to do so would transform a repealed constitutional provision into a legislative decision and divine out of inaction a particularized legislative choice, especially when the operative effect in the case at hand would be to inhibit the voters' franchise. There, perhaps more importantly than elsewhere, we should avoid doctrinaire assumptions.

mittee did not present to the legislature a proposal limiting the time for filing a petition proposing a law. That question has neither been considered nor decided by the legislature. The legislature has not acted.

There is, therefore, no viable statutory provision limiting the time for filing a petition proposing a law.

I concur in the issuance of a writ of mandamus.

O'HARA, J. (*dissenting*). I am in respectful disagreement with my colleagues.

I perceive no impingement upon the constitutional right of initiative by the statute involved. Rather, it seems to me to be a legislative attempt to expedite the initiatory process by guaranteeing legislative action as early as possible in any given session. This fact is emphasized by the specific executive recommendation to the Second Special Session of the Seventy-Second Legislature, the legislative action by the bipartisan Joint Interim Committee, and the constitutionally-mandated recommendations of the attorney general. I quote what I consider relevant from the Senate and House Journal of the First and Second Extra Sessions of 1963 (Journal of the House, Second Extra Session, pp 19–20) containing the special message of the Governor:

"* * * Accepting his responsibilities under the new constitution the Attorney General has recommended areas where the Legislature must act. To the distinct credit of the Legislature, a Joint Interim Committee composed of Republicans and Democrats from both houses has been hard at work since June [1963] developing specific legislation necessary to meet immediate requirements necessary before January 1, 1964 * * * . Thus, I submit for your consideration and legislative action the following

subjects:  *  *  *  8. Procedures for Initiative and
Referendum." (House Journal, *supra*)

I can only conclude from the foregoing that the
legislature responded not to a "summons [of] legis-
lative aid," as that phrase is used in the *Hamilton*
case, discussed later herein, but to the imperative
constitutional edict that "the legislature shall imple-
ment the provisions of this section," by continuing
reliance upon what was correctly concluded to be a
valid statute maintained by the saving clause of
Article III, § 7, and remaining in full force and ef-
fect.

My total thesis is precisely this. The legislature
is under a constitutional mandate to act upon initia-
tory legislation within 40 session days from the time
the petition is received by the legislature. This is a
race against fixed time. I do not understand how
any race can be run without a starting time. That
starting time was fixed by the legislature in the
requirement that the petition be filed with the Secre-
tary of State ten days before the constitutionally-
fixed time for the convening of each legislative
session.

Admittedly the legislature cannot thwart the
initiatory process by unreasonable time demands for
filing of the petition with the Secretary of State.

Persistent bench questioning on oral argument
elicited a consensus response for counsel that a rea-
sonable time to allow for both the necessary adminis-
trative action by the Secretary of State and legisla-
tive deliberation is permissible and necessary to
avoid utter chaos in the subsequent elective process.
Thus, the test is "reasonableness", a concept in law
as old as the common law itself. I regard the basis
of the test to be a time reasonably related to the ac-
complishment of what must be done. With partic-

ular reference to those factors which the chief judge points out were absolutely necessary when the legislature met only in the odd-numbered years and there was a general spring election, I am moved to say that I am sure the Joint Interim Committee, and consequently the whole legislature, was likewise aware of the situation. It was still the legislative judgment that the 10-day provision should be retained. It is that judgment for which I cannot substitute a judicial judgment.

I note with increasing concern that courts view the concept of "reasonableness" in this context as a subjective judicial judgment, rather than a legislative determination. I am unsympathetic to the view. We are, in form, a representative government of three co-equal and co-ordinate branches. The normal method of statutory enactment is by the legislative process. Initiatory action is a safety device as is the referendum. They reserve to the people the right of direct action over the head of an unresponsive legislature. But this *caveat* abides; unresponsiveness may not be judicially assumed. Rather the converse is to be assumed. The instant issue *was* the subject of both legislative action, and initiatory action within the space of two years. Can it be said the electorate has been deprived of either representative legislative action, or direct action on this question?

There is a strong presumption of constitutionality of a legislative enactment. See *Doyle* v. *Election Commission of City of Detroit* (1933), 261 Mich 546. It is not the function of courts on review to look with critical eye for every suggestion of unconstitutionality. Rather it is their function to resolve each doubt in favor of constitutionality. I entertain no suggestion of unconstitutionality in the instant case, but if I did I would resolve it contrary to the result

reached by my colleagues. An oligarchy of the judiciary is no less constitutionally repugnant than a legislative oligarchy.

We are cited in support of plaintiff's petition, principally, *Hamilton* v. *Secretary of State* (1923), 221 Mich 541, appearing again at (1924) 227 Mich 111, and *Yenter* v. *Baker* (1952), 126 Colo 232 (248 P2d 311). The first citation is totally inapposite for it deals with the question of numerical sufficiency of signatures, an issue not involved here. The second *Hamilton* case with two Justices signing a "dissent" and a third concurring in that result, and two Justices writing a "majority" view and three Justices concurring in that result, if law at all, is inapplicable here. The case dealt with a constitutional provision (amendments of 1913 and 1941 to the 1908 Constitution) that prescribed the minutiae of the initiatory process. The case as earlier noted did not deal with a "summons [of] legislative aid". There is sound basis to conclude that the very unwieldiness of trying to particularize in a constitution a procedural method of initiatory peition was what led the people through the constitutional convention to omit particulars and mandate legislative implementation.

*Yenter, supra,* is even less in point. In that case the legislature clearly impinged upon the constitution by enlarging upon a constitutionally-fixed filing time.

The greatest mischief that could possibly arise in this case is that this once-rejected initiatory legislation will miss being placed on the ballot again this fall (1970). It is however clearly eligible for representation at the general election in 1972.

If this indeed be a mischief, it were well to recall the sage observation of the late Mr. Justice Frank-

furter that there is not a judicial remedy for every michief in a democracy.

Plaintiffs presumptively knew the law when they began their signature drive; namely, that a statute valid on its face required filing with the Secretary of State ten days before the present legislative session began.    That they chose to wait until mid-June of an election year to offer the petitions and thus miss one general election does not move me to hold the statute unconstitutional.

Mandamus should not issue.