*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

LEAGUE OF WOMEN VOTERS OF MICHIGAN,
MICHIGANDERS FOR FAIR AND
TRANSPARENT ELECTIONS, HENRY MAYERS,
VALERIYA EPSHTEYN, and BARRY RUBIN,

      Plaintiffs-Appellants,

v

SECRETARY OF STATE,

      Defendant-Appellee.

FOR PUBLICATION
January 27, 2020
9:00 a.m.

No. 350938
Court of Claims
LC No. 19-000084-MM

---

SENATE and HOUSE OF REPRESENTATIVES,

      Plaintiffs-Appellants,

v

SECRETARY OF STATE,

      Defendant-Appellee.

No. 351073
Court of Claims
LC No. 19-000092-MZ

---

Before: SERVITTO, P.J., and BOONSTRA and GADOLA, JJ.

SERVITTO, P.J.

In these consolidated appeals, plaintiffs in both cases appeal as of right a September 27, 2019 opinion and order of the Court of Claims which addressed two central issues: the constitutionality of certain provisions of 2018 PA 608 and whether or not the Senate and House of Representatives had standing to seek to uphold the constitutionality of a validly enacted statute. We affirm in part and reverse in part.

-1-

## I. FACTS AND PROCEDURAL HISTORY

On December 28, 2018, 2018 PA 608 was signed into law. This public act amended the Michigan election law in several respects. First, the act amended MCL 168.471, governing petitions that propose an amendment to the Michigan Constitution, initiative petitions, and referendum petitions. Prior to amendment, this statute generally set forth the number of signatures that had to be obtained on the petitions and set forth timing requirements for filing the petitions. One of the features of 2018 PA 608 was to add a geographic requirement—limiting the total number of signatures to be used to determine the validity of a petition to no more than 15% from one congressional district.[1] Signatures in excess of the 15% would not be counted. Additionally, when filing petitions as provided for in that statute, submitters would be required to sort the signed petitions by congressional district and include a good faith estimate regarding the number of signatures from each district.

Second, the act amended MCL 168.477, governing the sufficiency of a petition. 2018 PA 608 added a requirement that, when the Board of State Canvassers is making an official declaration of the sufficiency or insufficiency of an initiative petition, it may not count toward the sufficiency of the petition any valid signature of a registered elector from a congressional district submitted on that petition that is above the 15% limit described in MCL 168.471.

Third, the act amended MCL 168.482.[2] This statute previously addressed only the format and content of acceptable petitions. The amendment requires sponsors of ballot petitions to gather signatures on forms designated by congressional district, rather than by county, the designation previously used. The amendment further adds several parts which require paid petition circulators,[3] before gathering signatures, to file an affidavit with the Secretary of State (the Secretary) disclosing their non-volunteer status,[4] mandates that new petition forms contain a check-box for a circulator to indicate whether they are a paid circulator,[5] and requires petition forms to contain a statement that, if a petition circulator fails to comply with the requirements, all signatures obtained by that circulator are invalid and will not be counted.[6] In addition,

---

[1] Michigan is divided into 14 congressional districts. House.gov/representatives#state-michigan (accessed 01/016/2020). All congressional districts span multiple counties except one: only District 13 involves a single county, the County of Wayne. See 2011 PA 128.

[2] PA 608 made other substantive changes to the Michigan election law, but those changes have not been challenged in this appeal, so they are not detailed here.

[3] The statute defines a "paid signature gatherer" as "an individual who is compensated, directly or indirectly, through payments of money or other valuable consideration to obtain signatures on a petition as described in section 471." MCL 168.482d.

[4] MCL 168.482a(1).

[5] MCL 168.482(7).

[6] MCL 168.482(8).

circulators who provide false information relating to their status as a paid circulator would be subject to criminal prosecution for a misdemeanor.[7]

On January 22, 2019, the Secretary, who is the chief election officer of the state and has supervisory authority over local election officials,[8] asked Michigan Attorney General Dana Nessel for a formal opinion regarding the constitutionality of PA 608 because it added new provisions regarding the invalidation of petition signatures that would have been considered lawful under the prior law. By statute, the Attorney General gives opinions on questions of law posed by state officers. See MCL 14.32.

Relevant to the instant appeals, the Secretary inquired about the constitutionality of PA 608's cap at 15% on the number of signatures allowable per congressional district, the requirement for submitters to sort petitions by congressional district, and the obligation for submitters to include a good faith estimate of the number of signatures. The Secretary also asked whether the requirements for paid signature gatherers to file an affidavit before circulating petitions and a disclosure on the face of the petition that a circulator is paid were constitutional, and whether she retained the authority to set forth the petition form for statewide ballot proposals in light of PA 608's mandate that sponsors use a congressional district form rather than a countywide form.

On May 22, 2019, the Michigan Attorney General issued Attorney General Opinion No. 7310. In the opinion, the Attorney General stated that the 15% geographic requirement based on congressional districts violates the petition and amendment provisions of the state Constitution, neither of which limit the number of signatures collected from one geographic region. She also opined that the requirement for circulators to indicate on petitions whether they were paid did not further any asserted governmental interest and exposed the circulators to the risk of "heat of the moment" harassment, such that it was unconstitutional. The Attorney General additionally stated that no state interest was apparent regarding why the Secretary would need to receive an affidavit from the circulator regarding their paid status, particularly where the petitions will contain circulators' addresses, and thus concluded that the affidavit requirement was not substantially related to Michigan governmental interests and was unconstitutional. The Attorney General concluded that the following sections that were unconstitutional could be severed from the remainder of the act:

1. The portions of MCL 168.471, 168.477, and 168.483(4) involving the 15% geographic requirement;

2. MCL 168.482(7), 168.482c regarding the check-box requirement; and

3. MCL 168.482a(1),(2) involving the pre-circulation affidavit.

---

[7] MCL 168.482c.

[8] MCL 168.21. See also Const 1963, art 5, § 3.

-3-

On May 23, 2019, plaintiffs, League of Women Voters of Michigan, Michiganders for Fair and Transparent Elections, Henry Mayers, Valeriya Epshteyn, and Barry Rubin, (collectively, "League of Women Voters") filed a complaint in the Court of Claims against the Secretary for declaratory and injunctive relief. In their complaint, plaintiffs asserted that the 15% cap per congressional district on petition signatures is an unconstitutional effort to amend the constitution by legislation, violates the constitutional rights of free speech and association, and violates the right to petition. They further asserted that invalidation of signatures for technical circulator errors or omissions violates the same constitutional rights with respect to petition proponents and signers, and also violates due process. These plaintiffs thus sought a declaration that the challenged provisions of 2018 PA 608 are unconstitutional and additionally sought a permanent injunction barring defendant and her agents, officers, and employees from enforcing or giving any effect to the challenged provisions.

On June 5, 2019, the Michigan Senate and Michigan House of Representatives (the Legislature) also filed a complaint in the Court of Claims for declaratory and injunctive relief against the Secretary. These plaintiffs challenged the May 22, 2019 opinion of the Attorney General finding certain provisions of 2018 PA 608 unconstitutional, and sought declarations that 2018 PA 608 is constitutional and a valid exercise of the Legislature's authority, and that the law must be implemented and enforced by the Secretary.

The plaintiffs in both cases filed motions for summary disposition in July 2019. The League of Women Voters moved for summary disposition in its action against the Secretary pursuant to MCR 2.116(C)(10), asserting that there is no genuine issue of material fact that 2018 PA 608 is unconstitutional in several respects. The Legislature likewise moved for summary disposition pursuant to MCR 2.116(C)(10), contending that there is no genuine issue of material fact that 2018 PA 608 is presumptively constitutional and further withstands any challenges to its constitutionality.

The Court of Claims consolidated the cases. In a July 29, 2019 order, the Court of Claims also ordered that any parties in either of the two cases before it, for purposes of judicial economy and the avoidance of unnecessary costs and duplication of effort, "shall be permitted to file motions and papers, argue in hearings, and otherwise participate in either of the consolidated cases, subject to any further orders of the Court." The League of Women Voters thereafter filed a second motion for summary disposition, this one against the Legislature pursuant to MCR 2.116(C)(6) and (10). The League of Women Voters asserted that the Legislature lacked standing to sue in the matter and that there was no genuine issue of material fact that 2018 PA 608 is unconstitutional.

After a hearing on all summary disposition motions, the Court of Claims issued a single opinion and order addressing all of the issues raised in both matters. At the outset, the Court of Claims determined that the Legislature had no standing to sue because it had not demonstrated a particularized injury that would be detrimentally affected in a manner different from the citizenry at large as is required to pursue its complaint, and that its complaint in Docket No. 19-000092-MZ must therefore be dismissed. The Court of Claims, however, treated the papers submitted by the Legislature as amicus briefs in the matter initiated by the League of Women Voters.

The Court of Claims next determined that the 15% geographic limit set forth in 2018 PA 608 is unconstitutional on its face. The Court of Claims reasoned that the Michigan Constitution contains a self-executing provision which reserves the power of the initiative and referendum process to the people, and the state Constitution establishes requirements in terms of the number of signatures needed to invoke the respective processes—without any limits on where those signatures can be gathered. The Court of Claims opined that the Legislature was not permitted to impose additional obligations or undue burdens, such as the 15% geographic limit, on the self-executing constitutional provision governing the initiative and referendum process. The Court of Claims reached a similar conclusion with respect to the right of the citizenry to petition for constitutional amendment. The Court of Claims further found that the 15% requirement in MCL 168.471 and other provisions in 2018 PA 608 relying on the 15% geographic requirement (MCL 168.477(1) and MCL 168.482(4)) could be and would be stricken from 2018 PA 608, and that the remainder of the act remained enforceable.

Next, the Court of Claims found that the requirement imposed on paid petition circulators in MCL 168.472(7) (requiring paid petition circulators to disclose their paid status on the face of petition sheets circulated to potential petition signers) does not substantially relate to a sufficiently important governmental interest and is thus unconstitutional on its face. The Court of Claims also found that this provision was severable from the remainder of 2018 PA 608.

The Court of Claims also found that MCL 168.482a, which requires paid petition circulators—but not volunteers—to file signed affidavits with the Secretary indicating that they will be paid to circulate a petition and to gather signatures, is not unconstitutional on its face. It also found that the signature-invalidating provisions found in MCL 168.482a do not violate petition signers' rights of free speech and free association, nor do they violate due process because they are content-neutral, nondiscriminatory, and represent merely a check imposed by the state on the integrity of the petition process.

In sum, the Court of Claims ordered that the League of Women Voters was entitled to summary disposition in the case they initiated with respect to their requests for declaratory relief that: (1) the 15% geographic requirement in MCL 168.471 is unconstitutional—as are the sections of PA 608 related to the 15% requirement and/or congressional districts, see MCL 168.477(1) and MCL 168.482(4); and (2) the check-box requirement in MCL 168.472(7) is unconstitutional. It ordered, however, that declaratory relief would not be entered in favor of the League of Women Voters concerning whether the affidavit requirement in MCL 168.482a(1) is unconstitutional on its face. The Court of Claims further granted summary disposition in favor of the Secretary in that matter with respect to whether the signature-invalidation requirements contained in MCL 168.482a are unconstitutional. Finally, the Court of Claims dismissed the Legislature's complaint due to its lack of standing.

Appeals ensued in both cases and this Court consolidated the matters for review. *League of Women Voters of Michigan v Secretary of State; Senate v Secretary of State*, unpublished order of the Court of Appeals, issued November 8, 2019 (Docket Nos 350938, 351073). This Court further allowed appellants in both cases to file briefs, motions, and other filings as if they were appellees in the others' appeals (*League of Women Voters of Michigan v Secretary of State; Senate v Secretary of State*, unpublished order of the Court of Appeals, issued December 19, 2019 (Docket Nos. 350938, 351073) and ordered that the appeals would be decided on the briefs

filed, without oral argument, unless otherwise ordered. *League of Women Voters of Michigan v Secretary of State; Senate v Secretary of State*, unpublished order of the Court of Appeals, issued December 20, 2019 (Docket Nos. 350938, 351073).

## II. STANDARDS OF REVIEW

This Court reviews de novo a trial court's decision regarding a motion for a summary decision in a declaratory relief action. See *Michigan Ed Employees Mut Ins Co v Turow*, 242 Mich App 112, 114; 617 NW2d 725 (2000). The constitutionality of a statute presents a question of law, which also carries a de novo standard of review. *GMAC LLC v Treasury Dep't*, 286 Mich App 365, 372; 781 NW2d 310 (2009). And whether a party has standing is also a question of law subject to review de novo. *Groves v Dept of Corr*, 295 Mich App 1, 4; 811 NW2d 563 (2011).

## III. STANDING

On appeal, the Legislature contends that it has standing to pursue a declaratory judgment in these matters because it has an interest in having this Court uphold the legislation it has passed, has a real interest in the cause of action, and will be a vigorous advocate. Moreover, the Legislature asserts that it has a special right and substantial interest that will be detrimentally affected in a manner different than the citizenry at large. We disagree.

As an initial matter, this Court has jurisdiction over appeals by right "filed by an aggrieved party." MCR 7.203. *Black's Law Dictionary* (11th ed) defines "aggrieved party" as "a party entitled to a remedy; esp. a party whose personal, pecuniary, or property rights have been adversely affected by another person's actions or by a court's decree or judgment." "To be aggrieved, one must have some interest of a pecuniary nature in the outcome of the case, and not a mere possibility arising from some unknown and future contingency." *Federated Ins Co v Oakland Co Rd Com'n*, 475 Mich 286, 291; 715 NW2d 846 (2006).

Here the Legislature's arguments were fully considered and addressed by the Court of Claims, despite its holding that the Legislature had no standing. Indeed, the Legislature was permitted to file briefs in the League of Women Voters' case in the Court of Claims and with this Court. The Legislature did not file a brief specific to the League of Women Voters' case here, but its appellant's brief, which contained both captions and docket numbers, was docketed in the League of Women Voters' appeal. The Legislature would thus appear to derive no identifiable benefit in having this Court reverse the Court of Claims decision on the issue of its standing. Accordingly, under the unique circumstances of these cases, the Legislature has had the opportunity to assert its arguments and is not an "aggrieved party" entitled to appeal the Court of Claims decision as of right under MCR 7.203. In the interest of thoroughness, this Court will nevertheless address the standing arguments proffered by the Legislature on appeal.

" 'Standing is the legal term used to denote the existence of a party's interest in the outcome of the litigation; an interest that will assure sincere and vigorous advocacy.' " *Allstate Ins Co v Hayes*, 442 Mich 56, 68; 499 NW2d 743 (1993) (citations omitted). When standing is at issue in a case, "the question is whether the person whose standing is challenged is a proper

party to request adjudication of a particular issue and not whether the issue itself is justiciable." *Id* (quotation marks and citations omitted). "[A] litigant has standing whenever there is a legal cause of action. Further, whenever a litigant meets the requirements of MCR 2.605, it is sufficient to establish standing to seek a declaratory judgment." *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349, 372; 792 NW2d 686 (2010). "A plaintiff must assert his own legal rights and interests and cannot rest his claim to relief on the legal rights or interests of third parties." *Fieger v Comm'r of Ins*, 174 Mich App 467, 471; 437 NW2d 271 (1988). Where a cause of action has not been provided by law,[9] a plaintiff must have "a special injury or right, or substantial interest, that will be detrimentally affected in a manner different from the citizenry at large . . . ." *Lansing Schools Ed Ass'n*, 487 Mich at 372. Thus, a litigant may have standing if (1) the litigant has a special right that will be detrimentally affected in a manner distinct from the citizenry at large, or has met the requirements of MCR 2.605 or (2) when the Legislature has intended to confer standing on the litigant under a particular statutory scheme. *Id*.

In this matter, the Legislature filed a complaint for declaratory action pursuant to MCR 2.605. That rule provides, in pertinent part, that "[i]n a case of actual controversy within its jurisdiction, a Michigan court of record may declare the rights and other legal relations of an interested party seeking a declaratory judgment, whether or not other relief is or could be sought or granted." An "actual controversy" under MCR 2.605(A)(1) exists when a declaratory judgment is necessary to guide a plaintiff's future conduct in order to preserve that plaintiff's legal rights. *UAW v Cent Michigan Univ Trustees*, 295 Mich App 486, 495; 815 NW2d 132 (2012). Where no actual controversy exists, a plaintiff does not have standing to bring a declaratory action. *City of South Haven v Van Buren Cty Bd of Comm'rs*, 478 Mich 518, 534; 734 NW2d 533 (2007). The plaintiff therefore has the obligation to show that an actual controversy exists.

Given the definition of "actual controversy" for purposes of MCR 2.605, we are not convinced that the Legislature has demonstrated standing to pursue a declaratory action here. No declaratory judgment is necessary to guide the Legislature's future conduct in order to preserve its legal rights. *UAW*, 295 Mich App at 495. The Legislature's authority to enact laws is separate and distinct from this Court's role in determining whether any law passes constitutional muster. These "rights" and obligations of the two separate branches of government will remain the same, no matter what the outcome in this matter, such that the preservation of the Legislature's legal rights is not at issue.

While the Legislature asserts that it is the *only* real party in interest in ensuring that Michigan laws are enforced and upheld when the Attorney General will not do so, and may thus file a declaratory action pursuant to MCR 2.605, it has provided no authority or support for this position. This Court need not search for authority to sustain a party's position. *Schellenberg v Rochester Elks*, 228 Mich App 20, 49; 577 NW2d 163 (1998). Moreover, we find the Legislature's position unavailing.

---

[9] PA 608 does not create a specific cause of action or expressly confer standing on the Legislature to enforce the act's provisions.

Michigan appellate courts have not examined whether the Legislature as a whole has standing to challenge an Attorney General's opinion regarding the constitutionality of a statute. However, our Supreme Court has analyzed the standing issue in relation to individual legislators. In *Dodak v State Admin Bd*, 441 Mich 547; 495 NW2d 539 (1993), four legislators challenged the authority of the State Administrative Board to transfer funds between state departments. After the Governor asked the House and Senate Appropriations Committees to transfer funds, but the committees failed to act, the State Administrative Board transferred the funds. Four individual members of the Legislature, two of whom were members of the House and Senate Appropriations Committees, and the Speaker of the House and Minority Leader of the Senate, who selected at least some members of the appropriations committees, brought a declaratory action, arguing that the statutory authority for the transfer was unconstitutional.

In their complaint, they alleged that the transfer actions of the board reduced their effectiveness as legislators, nullified the effect of their votes, interfered with the authority of plaintiffs as members of the House and Senate Appropriations Committees to approve or disapprove intradepartmental transfers, and diminished the effectiveness of two of the plaintiffs who, as leaders, appoint members of their party to positions on the respective appropriations committees. *Id.* at 554–55. Our Supreme Court noted that to establish standing, a legislator must overcome a heavy burden because, "Courts are reluctant to hear disputes that may interfere with the separation of powers between the branches of government." *Id.* at 555. Thus, plaintiffs who sue as legislators must establish that they have been deprived of a personal and legally cognizable interest peculiar to them, individually, rather than assert a generalized grievance that the law is not being followed. *Id.* at 556 (citations and quotation marks omitted).

Our Supreme Court ultimately concluded that only one of the four plaintiffs had shown a personal and legally cognizable interest peculiar to him because he, as a member of the House Appropriations Committee, had been deprived of his right to approve or disapprove transfers made by the State Budget Director. In contrast, the plaintiff on the Senate Appropriations Committee was without standing, as that committee actually had voted to approve the transfer, and that plaintiff was not suing regarding the effectiveness of his vote, but rather was suing "to reverse the outcome of a political battle he lost." *Id.* at 561. The Court rejected as without basis the arguments of the remaining two plaintiffs that the board's action infringed upon their authority to appoint committee members and that it affected the Legislature's power to override a line-item veto. *Id.* at 560-561.

Applying the above legal framework to this case, the Legislature has a heavy burden to show that it has standing. There is no dispute that the Legislature would be a vigorous advocate, as it asserts. The question, however, is whether it has an interest that is distinct from that of the general public. Nothing in the text of PA 608 supports that the Legislature has a substantial and distinct interest in its enforcement.

Attempting to distinguish *Dodak*, the Legislature argues that it did not lose a political battle and that it is not suing to reverse a legislative outcome. However, in light of the Attorney General's opinion, the Legislature is suing to reverse actions by the Secretary, a member of the Executive Branch. The Legislature is thus plainly challenging the actions of members of the Executive Branch. *Dodak* stands for the proposition that courts should not confer standing in matters that have the real possibility of infringing upon the separation of powers.

To accept the Legislature's argument that it has standing here would open the door for the Legislature to seek a declaratory judgment whenever the constitutionality of a statute was challenged. Further, PA 608 was designed not to benefit the Legislature, but to amend the Michigan election law to set forth new requirements for voter-initiated petitions for ballot proposals, and to invalidate signatures on noncomplying petitions. The Legislature simply has not shown that it has a special interest in voter-initiated petitions that differs from the citizenry at large.

The Legislature argues that it has an interest in upholding the legislation that it has passed. But here it is the role of the courts, not the Legislature, to determine whether PA 608 is constitutional. A legal ruling regarding the constitutionality of PA 608's provisions will not deprive the Legislature of personal and legally cognizable authority that is peculiar to those chambers alone. Though the Legislature is essentially asserting that PA 608 was not enforced in its entirety, that injury is not personal or unique to the Legislature. This is particularly so, given that once the votes of the legislators have been counted and the statute enacted, "their special interest as lawmakers has ceased." See *Killeen v Wayne Co. Road Comm'n*, 137 Mich App 178, 189; 357 NW2d 851 (1984). Moreover, the validity of any particular legislative member's vote is not at issue; the Public Act was duly enacted into law. Rather, here the issue is the constitutionality of new conditions for filing voter-initiated petitions, and it impacts Michigan voters who sign petitions.

Relying on our Constitution, the Legislature also argues that it has standing because it has the "exclusive constitutional authority to regulate elections in the State of Michigan." See Const 1963, art 2 § 4, and art 4, § 1. While the Legislature is correct that it has certain authority to regulate elections in Michigan, it fails to acknowledge the people's authority to bring petitions, which is also constitutionally based. Const 1963, art 2, § 9; Const 1963, art 12, § 2.[10] These specific constitutional provisions are explored more thoroughly in the next section. Suffice it to say that we are satisfied that the Legislature did not and does not have standing to bring a declaratory action in the matters at hand.

## IV. CONSTITUTIONALITY OF 2018 PA 608

### A. 15% GEOGRAPHIC REQUIREMENT

PA 608 amended the Michigan Election Law to add the following 15% geographic limit:

---

[10] While the Legislature also argues that "[l]eaving the Court of Claims Opinion in place will result in a single member of the executive branch being able to exercise unchecked veto power over a bill that has already been passed and enacted into law," the Court of Claims analyzed the Attorney General's legal conclusions, this Court scrutinized those conclusions, and presumably, our Supreme Court will also consider the legal conclusions in the Attorney General's opinion. In light of that review process, it cannot be concluded that the Attorney General has "unchecked veto power" over PA 608.

Not more than 15% of the signatures to be used to determine the validity of a petition described in this section shall be of registered electors from any 1 congressional district. Any signature submitted on a petition above the limit described in this section must not be counted. When filing a petition described in this section with the secretary of state, a person must sort the petition so that the petition signatures are categorized by congressional district. In addition, when filing a petition described in this section with the secretary of state, the person who files the petition must state in writing a good-faith estimate of the number of petition signatures from each congressional district. [MCL 168.471.]

PA 608 also amended the Michigan Election Law by indicating that signatures above the 15% geographic limit will not be counted by the Board of Canvassers:

The board of state canvassers may not count toward the sufficiency of a petition described in this section any valid signature of a registered elector from a congressional district submitted on that petition that is above the 15% limit described in section 471. [MCL 168.477(1).]

In addition, PA 608 requires petitions to indicate in which congressional district the people who sign the petition reside.

The Legislature argues that the requirements set forth above pass constitutional scrutiny and are valid means to ensure participation from voters within the entire state. The League of Women Voters, on the other hand, contends that the 15% cap contained within that statute violates the self-executing provisions regarding ballot proposals, and violates the rights to free speech, association, and petition. The Secretary agrees with the League of Women Voters.

In the context of a constitutional analysis, courts generally construe a statute as not violating the Constitution unless it clearly appears that the statute is unconstitutional. *In re Int'l Transmission Co*, 304 Mich App 561, 569; 847 NW2d 684 (2014). "Further, when considering a claim that a statute is unconstitutional, the Court does not inquire into the wisdom of the legislation." *Taylor v Smithkline Beecham Corp*, 468 Mich 1, 6; 658 NW2d 127 (2003).

There are two general types of constitutional challenges. Whereas an "as applied" constitutional challenge considers the specific application of a facially valid law to individual facts, a "facial" constitutional challenge considers the plain language of the challenged provision (i.e., on its face). *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 479 Mich 1, 11; 740 NW2d 444 (2007). Because PA 608 has yet to be enforced, the League of Women Voters' arguments regarding PA 608 fall within a facial challenge. See, *id*. A facial challenge is a claim that the law is "invalid in toto—and therefore incapable of any valid application . . . ." *Steffel v Thompson*, 415 US 452, 474; 94 S Ct 1209; 39 L Ed 2d 505 (1974) (citation and quotation marks omitted). In such a challenge, "[t]he party challenging the facial constitutionality of an act 'must establish that no set of circumstances exists under which the [a]ct would be valid.' " *Straus v Governor*, 459 Mich 526, 543; 592 NW2d 53 (1999) (citation omitted).

To determine whether the 15% geographic limit survives a facial challenge, we first look to the constitutional provision at issue. Const. 1963, art 2, § 9 governs initiative and referendum providing, in pertinent part:

> The people reserve to themselves the power to propose laws and to enact and reject laws, called the initiative, and the power to approve or reject laws enacted by the legislature, called the referendum. The power of initiative extends only to laws which the legislature may enact under this constitution. The power of referendum does not extend to acts making appropriations for state institutions or to meet deficiencies in state funds and must be invoked in the manner prescribed by law within 90 days following the final adjournment of the legislative session at which the law was enacted. To invoke the initiative or referendum, petitions signed by a number of registered electors, not less than eight percent for initiative and five percent for referendum of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected shall be required.

Constitutional initiative and referendum provisions, by which the people reserve to themselves a direct legislative voice, should be liberally construed to effectuate their purposes. *Bingo Coal for Charity--Not Politics v Bd of State Canvassers*, 215 Mich App 405, 410; 546 NW2d 637 (1996).

Significantly, Const. 1963, art 2, § 9 is a self-executing constitutional provision. *Wolverine Golf Club v Hare*, 384 Mich 461, 466; 185 NW2d 392 (1971). A constitutional provision is deemed self-executing, "if it supplies a sufficient rule, by means of which the right given may be enjoyed and protected, or the duty imposed may be enforced . . . ." *Wolverine Golf Club v Hare*, 24 Mich App 711, 725-726; 180 NW2d 820 (1970), aff'd sub nom. *Wolverine Golf Club*, 384 Mich 461 (quotation marks and citations omitted). "Whether a constitutional provision is self-executing is largely determined by whether legislation is a necessary prerequisite to the operation of the provision." *Id*. at 725.

Const. 1963, art 2, § 9 specifically reserves the initiative and referendum power to the people, and further provides a specific numerical mechanism through which to invoke the initiative or referendum— by obtaining "petitions signed by a number of registered electors, not less than eight percent for initiative and five percent for referendum of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected . . ." 2018 PA 608, however, clearly and unequivocally provides an *additional* requirement in the form of an obligation to limit signatures from specific geographic locations. "Not more than 15% of the signatures to be used to determine the validity of a petition described in this section shall be of registered electors from any 1 congressional district." MCL 168.471. It is settled law that the Legislature may not act to impose additional obligations on a self-executing constitutional provision. *Soutar v St. Clair County Election Commission*, 334 Mich 258, 265; 54 NW2d 425 (1952).

Moreover, legislation supplementary to self-executing constitutional provisions "must be in harmony with the spirit of the Constitution, and its object to further the exercise of constitutional right and make it more available, and such law must not curtail the rights reserved, or exceed the limitations specified." *Wolverine Golf Club*, 24 Mich App at 730, citing *State ex*

*rel Caldwell v Hooker*, 22 Okl 712, 718; 98 P 964 (1908). "Any statute which is both unnecessary for effective administration of the initiative process and restrictive of the initiative right is unreasonable and thus unconstitutional." *Id*. at 735. Here, the 15% limitation is not in harmony with the spirit of Const. 1963, art 2, § 9, which requires only a specified number of *electors'* signatures on relevant petitions, and limits, rather than furthers the exercise of the constitutional right, making it less available. It thus curtails the rights reserved.

We recognize that Const. 1963, art 2, § 9 also provides that "[t]he legislature shall implement the provisions of this section." The stricture of that section is, however, simply "a directive to the legislature to formulate the process by which initiative petitioned legislation shall reach the legislature or the electorate." *Wolverine Golf Club*, 384 Mich at 466. The clear intent in this provision is "to limit the power of the legislature to that which is 'necessary' to the effective implementation of the initiative right." *Wolverine Golf Club*, 24 Mich App at 735. Thus, while the Constitution places the duty of implementation of initiative and referendum provisions on the Legislature, it does so as an incident to the granting of a right to the people. Although administrative implementation is needed if the initiative process is to function smoothly, the administrative statutes may not create unnecessary burdens which tend to restrict the constitutional right. "The spirit of the Constitution is not met if the rights it grants are unnecessarily impaired under the guise of implementation." *Id*.

Despite the clear limiting intent of the implementation language in Const. 1963, art 2, § 9, the Legislature contends that this provision must be read in conjunction with Const. 1963, art. 2, § 4, and its broad delegation of power to the Legislature. Specifically, the Legislature directs us to Const. 1963, art 2, § 4(2), which states, in part:

> Except as otherwise provided in this constitution or in the constitution or laws of the United States the legislature shall enact laws to regulate the time, place and manner of all nominations and elections, to preserve the purity of elections, to preserve the secrecy of the ballot, to guard against abuses of the elective franchise, and to provide for a system of voter registration and absentee voting.

The question here, however, is not whether the Legislature has the power to legislate; the question is whether the restrictions implemented by the legislation constitute an impermissible burden on the petition processes, the power over which the people reserved for themselves more than a century ago.

The opening language of Const. 1963, art 2, § 4(2), "[e]xcept as otherwise provided in this constitution," signals that the legislative power is not unfettered, but instead is subject to other constitutional provisions. A reading of the constitutional provisions that pertain to petitions does not suggest that the Legislature may impose a requirement to cap the number of voter signatures to be counted from a particular geographic region. To the extent that the Legislature cites its authority to enact certain specifications for petitions, such as font size, clerical matters such as that simply cannot be compared to the 15% cap on voters' signatures promoted here.

Although the Legislature indicates that its goal in enacting the 15% limit was to ensure participation from voters in the entire state, participating in the voting process is a *right* held by

-12-

the *people*—not an obligation to be forced upon them by some means. And the 15% cap violates the rights of Michigan electors to participate in the electoral process by potentially excluding some from the petition process. Though the Legislature also generally asserts that PA 608 was intended "[t]o preserve the purity of elections and guard against abuses of the elective franchise related to ballot initiatives," the Legislature does not explain any specific impurities or abuses to be remedied by the 15% cap.

In *Todd v Election Comm'rs of Kalamazoo, Calhoun, Branch, Eaton & Hillsdale Cos*, 104 Mich 474, 483; 64 NW 496 (1895), our Supreme Court, quoting Justice Cooley's treatise on constitutional law, articulated the applicable standard courts are governed by in determining the constitutionality of acts passed by the Legislature to preserve the purity of elections. "All such reasonable regulations of the constitutional right which seem to the legislature important to the preservation of order in elections, to guard against fraud, undue influence, and oppression, and to preserve the purity of the ballot-box, are not only within the constitutional power of the legislature, but are commendable, and at least some of them are absolutely essential." [*Id.*, quoting Cooley, Const Lim 602.]. While the "purity of elections" concept has been applied in different factual settings, "it unmistakably requires . . . fairness and evenhandedness in the election laws of this state." *Socialist Workers Party v Secy of State*, 412 Mich 571, 598; 317 NW2d 1 (1982).

Given its absolute cap on voters' signatures among geographic districts, PA 608 cannot be characterized as setting forth an "evenhanded" restriction akin to the types of restrictions that have been upheld in the past. For example, in *Consumers Power Co v Attorney General*, 426 Mich 1; 392 NW2d 513 (1986), our Supreme Court addressed the constitutionality of 1973 PA 112, which instituted a rebuttable presumption that any signatures on petitions for constitutional amendments or initiative legislation that were made more than 180 days before the petition's filing date with the Secretary are stale and should be void. The statute's objective was to assure that only registered voters of Michigan could propose a constitutional amendment. *Id.* at 2-8. The restriction in that case can be considered closely aligned with its purpose to ensure that only Michigan registered voters signed petitions. In contrast, PA 608's objective has not been demonstrated to be closely related to the purity of the petition process. Further, here the 15% requirement is a ceiling, not a floor. Its effect would be to unconditionally deny untold numbers of registered voters the right to have their signatures counted, a fact that distinguishes it from the rebuttable presumption of staleness offered in *Consumers Power*.

Nothing in the plain language of Const. 1963, art. 2, § 4 provides a basis for the Legislature to control the number of voters' signatures to be counted toward a ballot petition and to categorically restrict voters who sign above the 15% limit of PA 608. Fairness and evenhandedness would be served by allowing all electors in the state who wish to sign a petition have their signatures count. In the absence of any reasonable, supported argument suggesting otherwise, we do not interpret the 15% cap as serving to preserve the purity of elections or guard against abuses of the elective franchise.

An important rule of constitutional construction "requires consideration of the circumstances surrounding the adoption of the constitutional provision and the purpose sought to be accomplished . . . ." *House Speaker v Governor*, 443 Mich 560, 580; 506 NW2d 190 (1993) (citation and quotation marks omitted). And "the most instructive tool for discerning the

circumstances surrounding the adoption of the provision is the floor debates in the Constitutional Convention record." *Id.* at 580-581. Significantly, the delegates to the 1961 Constitutional Convention considered adding a 25% geographic requirement to the Constitution. Proponents gave reasons similar to those offered here: to gain an informed electorate and to prevent placement on the state ballot matters of only very local interest. Opponents stated that all signatures of voters should be equally counted, and the rule of "one person, one vote" should hold true for petition signors as well. The delegates voted down the geographic requirement. (Official Record, Constitutional Convention 1961, p 3200-3201.) Thus, it is manifest that the people specifically and deliberately chose not to add a geographic requirement to the Constitution. Had the people wanted to tie a geographic condition to the process, they would have done so. The constitutional provisions relating to petitions simply do not reference a geographic requirement that is tied to the power of initiative, referendum, or constitutional amendment, and a geographic component is clearly outside not only the language of the relevant constitutional sections but also the intent of the drafters of these sections.

Differences of opinion on initiatives are commonplace and addressed, as they should be, through the voting process. Setting a 15% geographic limitation serves to take power out of the hands of the people and requires, in essence, a pre-vote of agreement in a certain number of congressional districts as to whether or not a matter should be put to a general vote. This places the cart before the horse and unduly burdens the initiative and petition process. That the process would be more difficult was unrebutted below, where the League of Women Voters filed affidavits with the Court of Claims detailing the myriad increased time and cost burdens imposed by the 15% geographic requirement.[11]

In reaching our decision, we ultimately need only reach back to the most basic principles set forth in *Marbury v Madison*, 5 US 137, 177-178; 2 L Ed 60 (1803):

> It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule. If two laws conflict with each other, the courts must decide on the operation of each.

> So if a law be in opposition to the constitution; if both the law and the constitution apply to a particular case, so that the court must either decide that case conformably to the law, disregarding the constitution; or conformably to the constitution, disregarding the law; the court must determine which of these conflicting rules governs the case. This is of the very essence of judicial duty.

> If then the courts are to regard the constitution; and the constitution is superior to any ordinary act of the legislature; the constitution, and not such ordinary act, must govern the case to which they both apply.

---

[11] We also note that the boundaries of congressional districts change every ten years and some districts have disappeared entirely throughout the years, providing yet more potential for confusion and added burdens associated with the 15% cap.

Those then who controvert the principle that the constitution is to be considered, in court, as a paramount law, are reduced to the necessity of maintaining that courts must close their eyes on the constitution, and see only the law.

This doctrine would subvert the very foundation of all written constitutions. It would declare that an act, which, according to the principles and theory of our government, is entirely void; is yet, in practice, completely obligatory. It would declare, that if the legislature shall do what is expressly forbidden, such act, notwithstanding the express prohibition, is in reality effectual. It would be giving to the legislature a practical and real omnipotence, with the same breath which professes to restrict their powers within narrow limits. It is prescribing limits, and declaring that those limits may be passed as pleasure.

We hold that PA 608, specifically the provision set forth in MCL 168.471 imposing a 15% geographic limit constitutes an unnecessary and, therefore, unreasonable restraint on the constitutional right of the people to initiate laws. It is thus unconstitutional. The same holds true for MCL 168.477 and 168.483(4), involving the 15% geographic requirement. As a result of this holding, we need not consider the League of Women Voters' alternative arguments on this issue.

B. CIRCULATORS

We next turn to the requirements set forth in 2018 PA 608 concerning petition circulators. Several parts of PA 608 are at issue. First, MCL 168.482 provides, in relevant part:

(7) Each petition under this section must provide at the top of the page check boxes and statements printed in 12-point type to clearly indicate whether the circulator of the petition is a paid signature gatherer or a volunteer signature gatherer.

(8) Each petition under this section must clearly indicate below the statement required under subsection (7) and be printed in 12-point type that if the petition circulator does not comply with all of the requirements of this act for petition circulators, any signature obtained by that petition circulator on that petition is invalid and will not be counted.

PA 608 also provides a criminal penalty for a false indicator of a circulator's status. MCL 168.482c provides: "The circulator of a petition under section 482 who knowingly makes a false statement concerning his or her status as a paid signature gatherer or volunteer signature gatherer is guilty of a misdemeanor." Finally, MCL 168.482a(1) requires that "[i]f an individual who circulates a petition under section 482 is a paid signature gatherer, then that individual must, before circulating any petition, file a signed affidavit with the secretary of state that indicates he or she is a paid signature gatherer." If a paid circulator has not filed the affidavit, any signature obtained by the circulator is invalid and, if a circulator's petition does not meet the necessary requirements under section 482, any signature on that petition is invalid. MCL 168.482a(2) and (4).

The Court of Claims concluded that the check-box requirement does not substantially relate to a sufficiently important governmental interest and is therefore unconstitutional. It upheld, however, the affidavit requirement. On appeal, the Legislature asserts that both requirements are constitutional, whereas the League of Women Voters asserts that neither is. We agree with the League of Women Voters.

The First Amendment provides that Congress "shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." The Fourteenth Amendment makes that prohibition applicable to the states. Where, as here, First Amendment rights are implicated, the Supreme Court has held that exacting scrutiny is applied.

In *Meyer v Grant*, 486 US 414; 108 S Ct 1886, 100 L Ed 2d 425 (1988), proponents of an initiative to amend the state of Colorado's Constitution brought an action to challenge the constitutionality of Colorado's statutory prohibition against paying circulators of initiative petitions. The proponents sought a declaration that the statutory payment prohibition violated their First Amendment rights. *Id*. at 416. On review, the Supreme Court noted that "[t]he freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment." *Id*. at 421. It then stated:

> The circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change. Although a petition circulator may not have to persuade potential signatories that a particular proposal should prevail to capture their signatures, he or she will at least have to persuade them that the matter is one deserving of the public scrutiny and debate that would attend its consideration by the whole electorate. This will in almost every case involve an explanation of the nature of the proposal and why its advocates support it. Thus, the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as "core political speech." [*Id*. at 421-422]

The Supreme Court opined that the prohibition on paid petition circulators restricted political expression by restricting the number of people who would carry the sponsors' message, thereby limiting the size of the audience, and would make it less likely that sponsors would obtain the necessary signatures, thereby limiting the odds that they could garner a statewide ballot proposal. *Id*. at 423. It thus determined that the statute involves a limitation on political expression subject to exacting scrutiny. *Id*. at 420.

Ultimately, the Supreme Court found that the statute violates the First and Fourteenth Amendments. "[L]egislative restrictions on advocacy of the election or defeat of political candidates are wholly at odds with the guarantees of the First Amendment. That principle applies equally to 'the discussion of political policy generally or advocacy of the passage or defeat of legislation.' " *Id*. at 428 (citation omitted). "The Colorado statute prohibiting the payment of petition circulators imposes a burden on political expression that the State has failed to justify." *Id*. In reaching its conclusion, the Court rejected the state's claimed interest in protecting the integrity of the petition process, reasoning that the state had not shown that it

needed to burden the sponsors' ability to communicate to preserve that process. The Court also noted that the state had not offered evidence that a paid circulator would be more likely to pad signatures, and declined to make that presumption. *Id.* at 424-426.

Similarly, in *Buckley v Am Constitutional Law Found, Inc*, 525 US 182, 186; 119 S Ct 636; 142 L Ed 2d 599 (1999), the Supreme Court reviewed conditions that Colorado statutes placed on the ballot-initiative process. Relevant to the instant matter, one of the conditions was the requirement that circulators wear identification badges bearing the circulator's name and whether the circulator was paid or was a volunteer. Recognizing that "the First Amendment requires us to be vigilant in . . . guard[ing] against undue hindrances to political conversations and the exchange of ideas," the *Buckley* Court held that the restrictions at issue "significantly inhibit communication with voters about proposed political change, and are not warranted by the state interests (administrative efficiency, fraud detection, informing voters) alleged to justify those restrictions." *Id*. at 192. The timing of the disclosure, at the same time the circulator's political message was revealed, was of significant importance to the *Buckley* Court because it "forces circulators to reveal their identities at the same time they deliver their political message; it operates when reaction to the circulator's message is immediate and may be the most intense, emotional, and unreasoned." *Id.* at 198-199 (citation and internal quotation marks omitted).[12]

*Meyer* and *Buckley* instruct that exacting scrutiny is applied to the core political speech at issue in this case. The exacting scrutiny standard "requires a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *John Doe No 1 v Reed*, 561 US 186, 196; 130 S Ct 2811; 177 L Ed 2d 493 (2010) (citation and quotation marks omitted). For a statute or regulation to survive exacting scrutiny, "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id*. (citation and quotation marks omitted). When a law burdens core political speech, exacting scrutiny applies and the restriction is upheld only if "it is narrowly tailored to serve an overriding state interest." *McIntyre v Ohio Elections Com'n*, 514 US 334, 347; 115 S Ct 1511; 131 L Ed 2d 426 (1995). Moreover, when the government burdens speech, "the government bears the burden of proving the constitutionality of its actions;" i.e., the government bears the burden of identifying a substantial interest and justifying its restriction. *United States v Playboy Entmt Group, Inc*, 529 US 803, 816–17; 120 S Ct 1878; 146 L Ed 2d 865 (2000).

Here the Legislature has not articulated a specific state interest directly aligned with PA 608's mandate that petition circulators check a box regarding their paid or volunteer status. The Legislature instead has indicated that PA 608 in general was designed to increase transparency in elections and accountability for voters. *Meyer*, however, weighed the state's interest in the integrity of the petition but found it did not outweigh the restriction on the sponsors' ability to communicate with voters.

---

[12] Although the *Buckley* Court expressly declined to address the constitutionality of the paid/volunteer indicator on the badge (*id*. at 200), the concerns about the timing of disclosures a circulator may otherwise choose to keep private are no less compelling in circumstances where the status of the circulator is at issue.

The Legislature relies upon *Citizens in Charge v Gale*, 810 F Supp 2d 916, 928 (D Neb, 2011), to support its position otherwise. Not only is this case not binding on this Court,[13] we are not persuaded by the decision reached in that matter. Significantly, the *Gale* court made its determination concerning a law that burdened core political speech by placing the burden on the parties alleging a violation of their First Amendment rights: "[n]either the plaintiffs nor the intervenors offered any significant or substantially credible evidence that the required language, color and type impaired their ability to obtain signatures." *Id*. at 928. This shifting of the burden was inappropriate given the clear mandate by our Supreme Court that, when First Amendment rights are implicated, "the government bears the burden of proving the constitutionality of its actions." *Playboy Entmt Group, Inc*, 529 US 816-817.

The check-box requirement forces petition circulators to make revelations to potential petition signers at the same time the circulators are delivering their political message and at a time "when reaction to the circulator's message is immediate and may be the most intense, emotional, and unreasoned[.]" *Buckley*, 525 US at 199. This type of compelled disclosure discourages participation in the petition circulation process and inhibits core political speech. See *id*. Again, for a statute or regulation to survive exacting scrutiny, "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *John Doe No 1*, 561 US at 196 (citation and quotation marks omitted). Where, as here, no real governmental interest has been asserted, let alone been proven, the circulators' right to be free of potential "heat of the moment" harassment and to protect their privacy regarding their status as either a paid circulator or a volunteer, as well as the sponsors' right to have circulators engage in discourse with voters, outweigh the state's generally stated interests in transparency and accountability.

The Legislature has simply not demonstrated that PA 608's check-box requirement is necessary to serve its vaguely-asserted interests. To the extent that the Legislature contends that the check box is intended to inform the electorate of a circulator's paid or volunteer status, if any potential signer seeks such information, they could simply ask the circulator. "The simple interest in providing voters with additional relevant information does not justify a state requirement that a writer make statements or disclosures she would otherwise omit." *McIntyre*, 514 US at 348. We hold that the check-box requirement is not narrowly tailored to serve an overriding state interest. The check-box requirement does not pass exacting scrutiny in this matter and is thus unconstitutional.[14]

---

[13] "Although lower federal court decisions may be persuasive, they are not binding on state courts." *Abela v Gen Motors Corp*, 469 Mich 603, 607; 677 NW2d 325 (2004).

[14] We recognize that the check-box appears to be a minor burden on circulators. However, even if this Court was to apply a lesser scrutiny, such as a sliding scale addressed in *Citizens for Tax Reform v Deters*, 518 F3d 375, 380 (CA 6, 2008), we would still find the check-box requirement unconstitutional. Although the burden applies in equal force to both paid and unpaid circulators,

We find that the same holds true for the affidavit requirement. Notably, PA 608 requires only petition circulators who are paid, but not volunteer circulators, to file an affidavit before circulating a petition and mandates that, if an affidavit is not filed, signatures collected by those circulators will not be counted:

> (1) If an individual who circulates a petition under section 482 is a paid signature gatherer, then that individual must, before circulating any petition, file a signed affidavit with the secretary of state that indicates he or she is a paid signature gatherer.

> (2) Any signature obtained on a petition under section 482 by an individual who has not filed the required affidavit under subsection (1) is invalid and must not be counted. [MCL 168.482a(1),(2).]

As noted, PA 608 also provides a penalty for a false indicator of that status.[15]

The United States Supreme Court has clearly recognized First Amendment protections for paid petition circulators. In *Meyer*, the Supreme Court struck down Colorado's prohibition on the use of paid petition circulators. In *Buckley*, the Supreme Court rejected, on First Amendment grounds, portions of a Colorado statute requiring reports disclosing information regarding only paid petition circulators' names, addresses, and amounts paid to those circulators. *Buckley*, 525 US at 201-204. The Supreme Court held that "[l]isting paid circulators and their income from circulation forc[es] paid circulators to surrender the anonymity enjoyed by their volunteer counterparts," and that the reporting requirements were "no more than tenuously related" to the substantial state interests that disclosure serves, ruling that, to the extent that reports targeted paid circulators, they failed the exacting scrutiny test. *Id*. Although *Buckley* is distinguishable because the legislation at issue in that case required the disclosure of the circulator's name and other identifying information, the affidavit requirement here still makes circulators fulfill a requirement that their volunteer counterparts need not.

The affidavit requirements do not simply target paid circulators, similar to the provisions struck down in *Buckley*, they also impose substantial burdens on paid circulators that are not shared by volunteer circulators. First, although PA 608 contains a definition of a "paid signature gatherer,"[16] there may be issues concerning the clarity of that definition. If circulators have any doubts regarding their status, they may not be aware of the need to file a pre-circulation affidavit.

---

the fact remains that the Legislature has offered no realistic justification for the burden, as is its obligation when burdening First Amendment core political speech.

[15] See MCL 168.482c.

[16] The statute indicates that a paid circulator is "an individual who is compensated, directly or indirectly, through payments of money or other valuable consideration to obtain signatures on a petition as described in section 471."

This could infringe on the voters' right to political speech because the voters' signatures on those circulators' petitions would not be counted.

Second, as demonstrated from the affidavits in the lower court record, time is of the essence in any petition campaign. The affidavit requirement will make sponsors' political speech more difficult by increasing the time required in petition drives where paid circulators must file affidavits before circulating any petitions. Volunteer circulators would not, of course, be subject to the more limited time frame necessarily required of paid circulators.

Third, the affidavit requirement for some circulators, but not others, based on whether work is paid, will result in harsher treatment for organizations that must rely on paid circulators. See *Riley v National Federation of the Blind of North Carolina, Inc*, 487 US 781, 799; 108 S Ct 2667; 101 L Ed 2d 669 (1988) (explaining that a requirement applying to only paid personnel making charitable solicitations "necessarily discriminates against small or unpopular charities" that typically rely on professional fundraisers).

Given the fact that the affidavit must be submitted before signatures may be collected, and that it applies only to paid signature gatherers, it can be seen as imposing a significant burden on the right of political speech protected by the First Amendment. This Court must balance this burden against the state's interests in transparency and providing voters with useful information about the electoral process.

The Legislature has not shown why an affidavit relating to an individual circulator's status, rather than information from sponsors of a petition, would aid in serving the state's interests. It is beyond dispute that Michigan has an important interest in an orderly petition process. The Legislature, however, has presented very little basis for a conclusion that PA 608's requirement for a pre-circulation affidavit to be filed only by people who receive remuneration for their petition circulation is either necessary or substantially related to that interest. Indeed, the Secretary indicates in her appeal brief that under existing law, petitions must already contain the circulator's address, and that "[i]t is not apparent why she would need, or be helped by, receiving the additional detail that a circulator is paid."

The Legislature has not shown that the state's interests are furthered by the disclosure requirement, which singles out only paid circulators and burdens the sponsors' political speech by imposing a requirement that circulators must file an affidavit before obtaining signatures. The affidavit requirement is thus unconstitutional.

## V. SEVERABILITY

Having found certain portions of 2018 PA 608 unconstitutional, we must necessarily address whether such portions can be severed from the remainder of the Act.

PA 608 does not address severability. However, it is undisputable that Courts have statutory authority to sever unconstitutional portions of statutes from the whole:

> In the construction of the statutes of this state the following rules shall be observed, unless such construction would be inconsistent with the manifest intent of the legislature, that is to say:

> If any portion of an act or the application thereof to any person or circumstances shall be found to be invalid by a court, such invalidity shall not affect the remaining portions or applications of the act which can be given effect without the invalid portion or application, provided such remaining portions are not determined by the court to be inoperable, and to this end acts are declared to be severable. [MCL 8.5.]

Moreover, it has long been held that courts will not invalidate an entire act if the offending provisions can be severed from the act. *Avis Rent–A–Car Sys, Inc v City of Romulus*, 400 Mich 337, 348-349; 254 NW2d 555 (1977).

PA 608 can be given effect without the 15% geographic requirement, the check-box requirement, and the pre-circulation affidavit. There is and has been no argument otherwise. Thus, sections relating to those requirements are stricken from the Act. This Court affirms the Court of

Claims ruling which struck the 15% geographic requirement in sections MCL 168.471, MCL 168.477(1), and MCL 168.482(4), as well as the check-box requirement in MCL 168.472(7). We reverse the Court of Claims ruling that the affidavit requirement passes constitutional muster and strike the pre-circulation affidavit requirement of MCL 168.472(2).

Affirmed in part and reversed in part.

/s/ Deborah A. Servitto
/s/ Michael F. Gadola